HERBERT SCHELLENBARG AND CLARA SCHELLENBARG, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67872.  Filed March 31, 1959.

*William R. Seaman, Esq., Jerry L. Cowan, Esq.,* and *William Harrelson, Esq.,* for the petitioners.

*Eugene M. Corbin, Esq.,* and *L. Justin Goldner, Esq.,* for the respondent.

TIETJENS, *Judge:* This proceeding involves deficiencies in income tax and additions thereto in the amounts and for the years as set forth below:

| Year | Deficiency | Additions to tax | | |
|---|---|---|---|---|
| | | Sec. 293(b) | Sec. 294(d)(1)(A) | Sec. 294(d)(2) |
| 1950 | $4,418.08 | $2,209.04 | $417.38 | $278.24 |
| 1951 | 26,721.78 | 13,360.89 | 2,416.90 | 1,611.27 |
| 1952 | 7,139.78 | 3,569.89 | 632.60 | 416.40 |
| 1953 | 6,396.04 | 3,198.02 | | 359.78 |

The issues for decision are: (1) Whether petitioners had unreported income for the years 1950 through 1953; if so (2) whether any part of the resulting deficiencies was due to fraud with intent to evade tax; and (3) whether petitioners are liable for additions to tax under section 294(d)(2) of the 1939 Code for the years 1950 through 1953.

Some of the facts were stipulated.

### FINDINGS OF FACT.

The stipulated facts are so found, and are incorporated herein by this reference.

During the years in issue, petitioners Herbert and Clara Schellenbarg, husband and wife, resided in Bradford, Ohio. They filed joint Federal income tax returns for those years with the district director of internal revenue at Cincinnati, Ohio.

At all times material hereto, petitioners were engaged in the business of buying and selling scrap metal, rags and paper, and also the buying and selling of used cars. They operated a junkyard on a 2-acre lot in an area adjacent to their home in Bradford. In conjunction with this work, they engaged in demolition and salvage work. To aid them in these operations, they utilized a crane and two trucks. A small building was located in the yard which served as a storage shed, and housed scales used for weighing the materials in which petitioners dealt.

Both petitioners had only a limited formal education, Herbert having attended various public schools to the seventh grade, and Clara having attended public schools to the ninth grade. Neither had any bookkeeping or accounting experience or training. As more fully set forth below, they kept no formal business records. At the close of each year, the few records which they kept were taken to the individual who prepared their annual tax returns. In most instances no attempt to organize this material was made prior to its delivery to this individual.

Petitioners acquired the scrap sold in various ways. Approximately one-half of the purchases were made at the Bradford yard. Payments for materials purchased, based upon weight, were made in cash from a money sack maintained for that purpose. No cash register was kept in the yard. When necessary, withdrawals from petitioners' checking account would be made, or checks cashed, and these funds would be used to replenish the money kept in the sack. Whenever a purchase was made at the yard, the date, weight of the item purchased, and the amount paid would be recorded on a tablet which was kept near the scales for that purpose. This tablet, referred to by the petitioners as their purchase book, contained numerous pages

having the caption "Herbert Schellenbarg Junk Yard" printed on them. As a tablet was filled it was taken to petitioners' home and placed in a file cabinet. In some instances, weights would be recorded without prices. In others, entries would be made on the back of the individual sheets or on the covers of the tablets. On occasions petitioners' younger children would take these tablets from the cabinet and play with them. A fire destroyed the area in which petitioners kept their scales, as a result of which the scales were removed for repairs. At that time sheets of paper and pads, badly burnt and beyond salvage, were discovered underneath the weighing platform.

The other half of petitioners' scrap purchases were made away from the yard. The materials so purchased would either be returned to the yard or delivered to an ultimate customer. Upon making such a purchase, Herbert would record the transaction on a slip of paper which he would give to Clara on his return home. No regular system of accounting for these away-from-home purchases was maintained. Included among them was the scrap acquired as a result of demolition and salvage work. In the case of such demolition work, a nominal fee was usually paid for the right to demolish an existing structure, any salvage obtained becoming the property of petitioners. Occasionally Herbert would fail to turn over his purchase record to Clara for recording. Sometimes, after his clothing had been washed, he found illegible bits of paper in his pockets which he suspected were the remnants of one of these purchase records.

The bulk of petitioners' scrap sales were made to various scrap brokers. In response to order, the scrap would be delivered either to the customer's place of business, or to a nearby mill for melting down, or to a railroad siding where it was loaded for shipment to a distant mill. Frequently, upon obtaining an order, petitioners would receive an advance from the customer to be utilized in obtaining the scrap for the order. These advances totaled $14,000 in 1950, $16,000 in 1951, $20,000 in 1952, and $13,975 in 1953.

Payment for these sales was made to petitioners in cash or by check drawn on the customer. When a delivery was made to a customer's place of business, payment was usually made on the basis of its weight and the current market price. In the case of a delivery to a mill, the material was weighed, and a ticket, showing its weight but not its price, was given to the deliverer. These tickets were accumulated by petitioners, and later presented to the customer for payment. In the case of material shipped by rail, petitioners would be paid by check; the amount received being adjusted for any advances made by the customer on the order, and for shipping charges.

Whenever petitioners received a check in payment for scrap sold they either would deposit it in their checking account, or cash it and

use the money for business expenses, or endorse the check to third parties. On some occasions these third party endorsements were in consideration for purchases made from them by petitioners. Out of 39 such checks, covering the years in issue, Herbert Schellenbarg appeared as the second endorser three times and Ben Schellenbarg appeared as the second endorser five times. Other second party endorsers included various individuals and places of business not otherwise identified.

In the case of most sales, the customer tendered an invoice reflecting the transaction. Petitioners kept these invoices in a dish in a cupboard in their home. In the case of a substantial cash sale made at the yard an invoice was prepared and kept in the dish with the others. Small cash sales at the yard were recorded in a black ledger book.

During the years in issue, Ben and William Schellenbarg, Herbert's brothers, operated a junkyard in Union City, Indiana. On occasions, when filling a particular order, Herbert would let his brothers furnish a portion of the scrap sold. The delivery would then be made to the customer in petitioners' name, and petitioners in turn would receive the total purchase price. Thereafter, Herbert would remit to his brothers their portion of the receipts, depending upon the amount of scrap furnished by them. These remittances would be made either in cash, or by personal check, or by the endorsement of a customer's check to his brothers by Herbert. No records were kept with respect to these sales, petitioners considering them in the nature of wash transactions.

Toward the end of each year, Clara would total the numerous entries in the purchase books. Then these books, along with other records, were turned over to the individual preparing petitioners' tax returns for the year. Petitioners indicated to the accountant who prepared their 1952 and 1953 Federal tax returns that certain of the purchase books for those years were missing. In arranging the data delivered to him, the accountant noted that there were unexplained gaps in the dates of these books. Further, he had no recollection of having been given the black ledger book wherein small cash sales at the yard were recorded, to assist him in preparing petitioners' returns for these years.

Set forth below are the total gross business receipts reported by petitioners on their Federal income tax returns for the years in issue, and the portions thereof attributable to the sales of scrap for each of those years:

| Year | Reported gross receipts | Amount attributable to scrap sales |
|---|---|---|
| 1950 | $53, 767. 43 | $52, 014. 03 |
| 1951 | 52, 832. 50 | 50, 743. 55 |
| 1952 | 72, 553. 88 | 71, 393. 88 |
| 1953 | 33, 350. 33 | 28, 463. 52 |

The parties have agreed that petitioners received the following amounts for scrap delivered to various companies in addition to those amounts which they reported on their returns for the respective years:

| Year | Unreported receipts |
|------|------|
| 1950 | $11, 022, 08 |
| 1951 | 46, 712. 10 |
| 1952 | 14, 421. 55 |
| 1953 | 23, 001. 53 |

Petitioners also received the following amounts of net rental income and interest income which they failed to report on their Federal tax returns for the respective years in issue:

| Year | Net rentals | Interest |
|------|------|------|
| 1950 | $12. 03 | $219. 95 |
| 1951 | 225. 19 | 260. 60 |
| 1952 | 73. 31 | 55. 89 |
| 1953 | 51. 42 | --------- |

On their returns for the years in issue petitioners claimed deductions for expenses incurred in their various businesses. These included amounts expended for scrap purchases, used cars, and costs in connection with their demolition and salvage work. Set forth below are the amounts which they claimed as a deduction for the cost of "Merchandise bought for manufacture or sale" on their returns for each of the years in issue:

| Year | Deduction claimed |
|------|------|
| 1950 | $39, 065. 79 |
| 1951 | 38, 876. 22 |
| 1952 | 55, 578. 41 |
| 1953 | 21, 593. 79 |

From the outset, petitioners cooperated fully with the internal revenue agents assigned to investigate their case. A preliminary investigation revealed two specific scrap sales made early in 1952 which petitioners failed to report on their return for that year. Petitioners' explanation was that these sales were made at the time of their vacation, and that in their haste they apparently forgot to record them. The agents then compiled a list of the companies with which petitioners had dealt during the years in issue, which list was submitted to petitioners for approval. From the ledger cards and invoices maintained by these companies under the name of Herbert Schellenbarg, the agents prepared a schedule reflecting what they considered to be actual gross sales. An attempt was then made to identify the portion of gross receipts actually returned which represented the proceeds from scrap sales. A comparison was made between the schedule prepared on the basis of the company ledger cards and invoices, and the reported gross receipts identified as the proceeds from scrap sales. When informed that there was a discrepancy between reported gross scrap sales and what appeared to be

actual scrap sales, petitioners indicated that they had failed in many instances to record purchases of scrap made, and that this fact probably would account for the discrepancy. No actual proof of these claimed expenditures was ever furnished by the petitioners, though requested on more than one occasion by the investigating agents. In arriving at their total gross sales figures for each of the years in issue, the agents took into account all the advances on sales made by the various companies to the petitioners. Assuming petitioners had treated the sales made on behalf of Ben and William Schellenbarg as "wash" transactions, the agents made no allowance for these transactions in computing unreported gross sales for the years in issue.

On the basis of specific omissions, respondent determined that petitioners omitted the following items of income from their Federal tax returns during each of the years in issue:

| Year | Net rentals | Interest | Capital gains | Car sales | Scrap sales |
|------|-------------|----------|---------------|-----------|-------------|
| 1950 | $32.03 | $221.25 | $500 | $450.00 | $18,028.49 |
| 1951 | 225.19 | 261.96 | | 1,012.29 | 58,723.21 |
| 1952 | 73.31 | 56.22 | [1] 250 | 2,146.93 | 21,716.81 |
| 1953 | 51.42 | | [1] 125 | 1,745.00 | 28,147.44 |

[1] Designated as net capital gains.

In making this determination, respondent allowed petitioners all the deductions claimed by them on their returns, and further allowed as deductions the following items which were not claimed thereon:

| Year | Rental depreciation and expense | Additional depreciation | Error on return |
|------|--------------------------------|------------------------|------------------|
| 1950 | $370.47 | $460.00 | $10 |
| 1951 | 824.81 | 460.00 | |
| 1952 | 1,771.69 | 497.10 | |
| 1953 | 2,011.58 | 757.30 | |

In computing the addition to tax under section 294(d)(2) for the taxable year 1953, respondent credited petitioners with the payment of estimated tax in the amount of $318.70. On their 1952 tax return petitioners reported the tax due to be $81.30.

No part of the deficiencies for the years 1950, 1951, 1952, and 1953 was due to fraud with intent to evade tax.

OPINION.

Petitioners' principal contention is that respondent, in determining the deficiencies herein, failed to take into consideration unrecorded purchases of scrap, sales of scrap made on behalf of Ben and William Schellenbarg, and allowable depreciation on the building and scales used by them in their business. They maintain that as a result, his

determination is based on a formula which cannot produce the correct amount of the tax due, and further is arbitrary and excessive in nature within the rule of *Helvering* v. *Taylor*, 293 U.S. 507 (1935). Accordingly, they contend its presumptive correctness has been overcome, and that they are entitled to a judgment of no deficiency for each of the years in issue. Alternately, they claim the record contains no evidence which would support a deficiency for any of the years in issue; the contention being that respondent has failed to utilize a recognized method of reconstructing income pursuant to the authority given him under section 41 of the 1939 Code. They further contend there is no proof of the extent to which the additional receipts attributed to them represented sales on their behalf, or sales on behalf of others. Finally, they submit that respondent has offered no proof of the relationship between the receipts which he claims represent additional sales, and net income.

Petitioners' formal education was extremely limited. Though successful in the fundamentals of their trade, they displayed complete disdain for the more prosaic aspects of the business world such as the keeping of books and records. In making purchases of scrap at the yard petitioners would record the information with respect thereto in tablets, which, as they were filled, were placed in a filing cabinet for safekeeping. However at this point, petitioners' record-keeping system disintegrated into something short of chaos. Some entries in these books were incomplete insofar as they failed to reflect the prices paid; others were made on the backs of the pages and on the covers of the pads. Some tablets were unaccounted for, petitioners contending they were destroyed by fire, lost in and around the working area, or appropriated by their younger children.

Petitioners' away-from-home purchases fared no better. While Herbert seems to have made an effort to note the amounts expended on scrap purchased away from home, the fact of the matter is that no system for recording these amounts was ever utilized. Furthermore, Herbert was not as diligent in turning over his memoranda to Clara, as he claimed he was in making them. Occasionally he would find illegible crumpled bits of paper in the pockets of his clothes which appeared to him to be the remnants of a forgotten notation of purchase.

Being consistent in their approach, petitioners accorded the sales made during the taxable years similar treatment. Ordinarily, a purchaser would provide them with an invoice of the transaction, which was kept in a dish in their family cupboard. Invoices of substantial cash sales at the yard were similarly retained. Though smaller cash sales at the yard were recorded in a ledger book used for that purpose, the accountant preparing petitioners' 1952 and 1953 returns was unable to recall having been given this book for use in computing

their income for those years. Moreover, no records whatsoever of sales made on behalf of Ben and William Schellenbarg were kept, petitioners treating these as wash transactions upon which no profit was made.

At the close of each year, petitioners gathered together whatever records they had with respect to that year's business, and turned them over to the accountant who prepared their annual returns. No attempt to organize any of these materials was made, the burden being placed squarely on their accountant. His worksheets for the years 1952 and 1953, submitted in evidence herein, indicate that he utilized only that information supplied him by petitioners in preparing their returns for those years.

It was then, in this state of affairs, that respondent's agents came upon petitioners' case. Early investigation revealed unreported sales in 1952, and its scope was broadened to cover all the years in issue. A list of companies which had purchased scrap from petitioners was prepared and submitted to petitioners for approval. Working from ledger cards on file with these companies under the name of Herbert Schellenbarg, respondent's agents prepared a schedule of purchases made by them from petitioners. A comparison of this schedule with gross sales reported by petitioners in their returns revealed major discrepancies. When asked for an explanation, petitioners indicated their unrecorded purchases probably accounted for the difference in figures. Though repeatedly asked for proof of these purchases by respondent's agents, petitioners came forward with no substantiating evidence.

Confronted with these circumstances, respondent reconstructed petitioners' income for each of the years in issue on the basis of specific omissions, setting forth additional income from the sale of scrap, the sale of used cars, rentals received, interest, and capital gains. All deductions claimed by petitioners on their returns were allowed. In addition, respondent allowed additional expenses related to rental income. On the basis of this reconstruction, respondent determined the instant deficiencies.

Petitioners do not contest the additional rental and interest income determined by respondent, and do not seriously contest the additional receipts from the sale of scrap attributed to them. In point of fact, they have stipulated, as set forth below, that portion of the additional scrap receipts determined by respondent which they concede they received:

| Year | Additional receipts determined by respondent | Additional receipts conceded by petitioners |
|---|---|---|
| 1950 | $18,028.49 | $11,022.88 |
| 1951 | 58,723.21 | 46,712.10 |
| 1952 | 21,716.81 | 14,421.55 |
| 1953 | 28,147.44 | 23,001.53 |

The great weight of their argument is directed at respondent's failure to offset these additional receipts by what they claim were unrecorded expenses, and unrecorded sales made by them on behalf of Ben and William Schellenbarg. Yet, in the face of repeated requests by respondent's agents, no evidence was produced to substantiate these unrecorded transactions. This failure of proof has extended to the instant proceeding. As noted, respondent has allowed in full the deductions claimed by petitioners on their returns, assuming, in the absence of evidence to the contrary, that no other expenditures had been incurred. See *United States* v. *Bender*, 218 F. 2d 869 (C.A. 7, 1955). In this posture, we cannot say the respondent's determination was arbitrary and excessive as contended by the petitioners. Thus, its presumptive correctness has not been destroyed, and the burden of disproving it still rests with the petitioners.

Though petitioners' inability to offer proof of these unrecorded transactions may work a seeming hardship upon them, it is unquestionably of their own making. The mere fact that a taxpayer is grossly negligent in keeping his books and records is not sufficient to overcome the respondent's determination; and yet, that is all that petitioners have established by the instant record. They concede unreported gross receipts, but maintain these should be offset by similarly unreported costs of goods sold. However, when asked to establish these unrecorded costs they maintain their lack of records precludes compliance. Clearly this is not sufficient to overcome respondent's determination.

In a further effort to substantiate their position, petitioners claim that respondent failed to utilize an accepted method of reconstructing income pursuant to the authority granted him by section 41 of the 1939 Code. They maintain that at least four separate methods were open to him, all of which he chose to disregard, i.e., increases in net worth, analysis of bank deposits, percentage markup, and the personal expenditures method. Section 41 of the Code provides, in the event the method of accounting utilized by the taxpayer does not clearly reflect income, that "the computation shall be in accordance with such method *as in the opinion of the Commissioner* does clearly reflect the income." (Italic supplied.) It is thus apparent that the choice as to the method of reconstruction to be employed lies with the Commissioner, and not the taxpayer, the only restriction being that the method adopted be reasonable. *Hyman B. Stone*, 22 T.C. 893, 905 (1954). Our consideration of respondent's method of reconstructing petitioners' income in the light of this record has led us to conclude it was not unreasonable. Thus we cannot say that he abused the authority vested in him by section 41 of the Code.

With respect to sales made by petitioners on behalf of Ben and William Schellenbarg the record is inconclusive. Apparently there were some such sales during the years in issue, but neither their frequency nor magnitude has been attested to here. Petitioners would have us assume that certain of those checks stipulated into evidence, bearing Herbert's name as payee and bearing the endorsement of Ben Schellenbarg, represent the proceeds of these scrap sales. However, we note that even though both petitioners testified herein, neither of them attempted to identify these checks as having been endorsed in consideration for scrap supplied. We cannot agree that the mere existence of a check bearing Herbert's name as payee and that of his brother Ben as second party endorser is a sufficient basis upon which to conclude that the face amount of that check constituted payment for scrap sold in petitioners' name on behalf of Ben and William Schellenbarg. There being no other evidence on this point, except petitioners' declaration that such sales existed and were treated by them as wash transactions, we have made no findings relative to the extent of these sales during the years under consideration. Were we to attempt to do so, the result would be based solely on inference and guesswork with no credible support whatsoever in this record.

Much the same reasoning has led us to conclude that no adjustment for unrecorded cost of goods sold can be made. Petitioners' testimony with respect to missing purchase books, undecipherable entries, and cash expenditures which were never recorded was general and vague. No dates, amounts, or specific items were testified to. In the light of the inconclusive nature of the evidence before us we do not believe this to be a proper proceeding in which to apply the oft-relied-upon *Cohan* rule. See *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930). We therefore have been unable to and have made no findings relative to the amount of these unrecorded expenditures. Moreover, we cannot say that they have not been included within those deductions claimed by petitioners on their returns in each of the years and allowed by respondent. Nor has there been presented any evidence to indicate that petitioners' net profit percentages on their income as reconstructed by the respondent are in any way unrealistic or arbitrary.

No evidence has been presented by petitioners with respect to the additional income determined by respondent to have been derived by them in the form of capital gains and used-car sales; nor with respect to their present claims for depreciation of the building and scales used by them in their business. Accordingly, respondent's determination in these particulars is sustained.

Our findings of fact are dispositive of the fraud issue.

With respect to the additions to tax under section 294(d)(2) for the years 1950, 1951, and 1952, petitioners rely upon *Acker* v. *Commis-*

*sioner*, 258 F. 2d 568 (C.A. 6, 1958), certiorari granted 358 U.S. 940 (1959), reversing T.C. Memo. 1957–17, holding that a double imposition of additions to tax, for failure to file an estimated tax return and for substantial underestimation of estimated tax, was not provided for by Congress in the case of a taxpayer failing to file an estimated tax return. We have held to the contrary in *J. D. Abbot*, 28 T.C. 795 (1957), affd. 258 F. 2d 537 (C.A. 3, 1958); *Josef C. Patchen*, 27 T.C. 592 (1956), affirmed on this issue 258 F. 2d 544 (C.A. 5, 1958); *Harry Hartley*, 23 T.C. 353 (1954), modified 23 T.C. 564 (1954); and *G. E. Fuller*, 20 T.C. 308 (1953), affirmed on other grounds 213 F. 2d 102 (C.A. 10, 1954). Also see *Hansen* v. *Commissioner*, 258 F. 2d 585 (C.A. 9, 1958), affirming on this issue T.C. Memo. 1957-113. With due respect for the conclusions of the Court of Appeals for the Sixth Circuit, we prefer to adhere to our position.

As to the year 1953, petitioners maintain that they timely filed a declaration of estimated tax; that the amount shown to be due thereon was $318.70; and that this amount exceeded the tax shown to be due on their return for 1952 by some $200. Relying on *Schwarzkopf* v. *Commissioner*, 246 F. 2d 731 (C.A. 3, 1957), modifying T.C. Memo. 1956-155, they contend that had Congress intended to compare the estimated tax with the tax based upon reconstructed income it should have so provided. While their declaration of estimated tax for 1953 is not in evidence, we note that respondent in computing the addition to tax under 294(d)(2) for that year, has credited petitioners with the payment of estimated tax in the amount of $318.70. In the absence of an objection by respondent, we assume this amount represents a timely payment made by them for that year within the meaning of the statute.

In the *Schwarzkopf* case the Court of Appeals for the Third Circuit agreed with this Court that the taxpayer had understated his income on returns for the years 1947 through 1951, and further agreed that part of the deficiency for each of those years was due to fraud with intent to evade tax. The court then proceeded as follows:

Finally, petitioner argues that he is not liable for penalties for underestimation of tax based upon Section 294(d)(2) of the 1939 Code for the years 1948, 1949, and 1951. We agree with petitioner's contention. The section in issue provides an exception from its penalty provisions for those years in which there has been a timely payment of estimated tax in an amount at least as great as it was "on the basis of the facts shown on his return for the preceding taxable year." Petitioner's estimated taxes for 1948, 1949, and 1951 were $4,000, $3,600, and $4,000, respectively. Each amount was greater than the amount of tax shown on taxpayer's returns for the preceding taxable years. If, as the Commissioner contends, Congress meant to compare the estimated tax with the tax based upon the reconstructed income, it should have so provided. The penalties under Section 294(d)(2) should not have been assessed for 1948, 1949, and 1951.

We have carefully read the pertinent statutory provision, and agree with the interpretation placed thereon by the Court of Appeals for the Third Circuit. We therefore have concluded that the addition to tax under section 294 (d) (2) for the taxable year 1953 was erroneously determined by respondent.

*Decision will be entered under Rule 50.*