T.C. Memo. 1997-232


UNITED STATES TAX COURT


RONNIE F. JUDY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12203-94.                        Filed May 20, 1997.


Ronnie F. Judy, pro se.

<u>Bonnie L. Cameron</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


BEGHE, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income tax and penalties for taxable years
1989 and 1990 as follows:[1]

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable years at
issue.  All Rule references are to the Tax Court Rules of
Practice and Procedure.

| | | Penalty |
|---|---|---|
| Year | Deficiency | Sec. 6662 |
| 1989 | $6,313 | $1,263 |
| 1990 | 17,439 | 3,488 |

After concessions by both parties, the issues for decision are:  (1) Whether petitioner failed to report income for 1989 and 1990 in the amounts of $7,439 and $36,663, respectively; and (2) whether petitioner is liable for negligence penalties under section 6662(a).  We hold for respondent on both issues.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated by this reference.  At the time the petition was filed, petitioner's legal residence was in Reevesville, South Carolina. During the years at issue petitioner operated a farm.  The primary sources of petitioner's income were sales of cattle, soybeans and grain.  Petitioner maintained a single bank account at the First Federal Savings & Loan of Walterboro for both personal and business use.  He did not deposit all farm receipts into this bank account.  He endorsed to third-party creditors some of the checks he received.  Petitioner concedes that he failed to maintain adequate books and records to account for his farming activities during the years at issue.  He further concedes that his Federal income tax returns for these years did

not reflect income he received from sales of crops and livestock as follows:

| Source | 1989 | 1990 |
|--------|------|------|
| Orangeburg Stockyard | $14,237 | $14,898 |
| Weathers Farm Supply | 2,146 | -0- |
| Four Holes Farm | -0- | 6,800 |
| Total | 16,383 | 21,698 |

Petitioner's tax returns for the years at issue were assigned to C. Kevin Cox (Cox), a special agent in the Criminal Investigation Division of the Internal Revenue Service (IRS). Cox interviewed petitioner in October 1992.

In response to Cox's questions about the source of funds for specific expenditures, petitioner gave the following explanation: He had borrowed what he needed from his father, Blease Judy (Mr. Judy). Mr. Judy's sister--petitioner's aunt--Lillie Mae Ellis, had died in 1985, leaving Mr. Judy $183,000. Mr. Judy had withdrawn the entire inheritance from various bank accounts in 1985, and secreted the cash in an ammunition box that he kept under his bed in the house he shared with petitioner's family. Mr. Judy had given petitioner permission to withdraw funds from the ammunition box for expenses with the understanding that petitioner would pay them back. On numerous occasions, petitioner had helped himself from the contents of the ammunition box, but was dilatory in repaying. At some point Mr. Judy had discovered to his dismay how much of his inheritance had been

thus depleted and moved the ammunition box to a new location unknown to petitioner.

For reasons not disclosed in the record, the criminal investigation was discontinued later that year and the case referred to the Examination Division of the IRS. The audit of petitioner's 1989 and 1990 returns was conducted by Revenue Agent Elizabeth Duffy (Duffy). Petitioner did not show Duffy any records. In the absence of records, Duffy reconstructed petitioner's income using the source and application of funds method. Under this method, she determined the total amount of petitioner's expenditures plus bank deposits in 1989 and 1990 and the total amount of funds available to him from identified sources in each year. In computing petitioner's available resources, Duffy included the $16,383 and $21,698 of receipts traceable to farm sales but not reported on petitioner's returns. To the extent that petitioner's expenditures plus deposits exceeded funds available from identified sources, she presumed that petitioner had additional unreported income from farming. Petitioner's uncorroborated account of his withdrawals of his father's inheritance from the ammunition box did not persuade her otherwise. The adjustments set forth in the notice of deficiency followed Duffy's computations.

Before trial respondent revised the revenue agent's computations on the basis of additional information obtained from

petitioner concerning his expenditures.  As a result of these revisions, the amounts in controversy are lower than those reflected in respondent's original adjustments.[2]  The revised computations set forth below are not disputed:

| Application of Funds | 1989 | 1990 |
| --- | --- | --- |
| Increase in bank account balance | $4,928 | - 0 - |
| Business equipment purchased per return | 4,583 | $900 |
| Real estate purchased | | 61,000 |
| Loan repaid to Dewey Cowart | 11,000 | 31,000 |
| Personal living expenses | 4,200 | 5,100 |
| Taxes and insurance withholdings | 2,967 | 1,168 |
| Expenses of estate of which petitioner was executor | 1,422 | 1,422 |
| Total funds applied | 29,100 | 100,590 |
| Sources of Funds | | |
| Adj. gross income per return | (138) | 624 |
| Depreciation per return | 5,416 | 3,942 |
| Loan received from Dewey Cowart | -0- | 31,000 |
| Decrease in bank account balance | -0- | 4,913 |
| Gifts from Mr. Judy | -0- | 1,750 |
| Total available funds reported | 5,278 | 42,229 |
| Unreported farm income specifically identified | 16,383 | 21,698 |
| Total funds available from identified sources | 21,661 | 63,927 |
| Residual amounts in controversy | 7,439 | 36,663 |

This case was tried on November 6, 1995, in Columbia, South Carolina.  One of the witnesses whom respondent subpoenaed was

---

[2] The revisions relate to two items:  Respondent conceded that a $20,500 expenditure for the purchase of a tractor trailer occurred in 1988 rather than 1989, and that petitioner's payments for child care in 1990 were $2,700 less than the revenue agent had supposed.

Mr. Judy. Mr. Judy accompanied petitioner to the trial and sat in petitioner's car outside the courthouse; petitioner represented to the Court that for health reasons his father would be unable to testify. During a recess, respondent's counsel went down to the parking lot to meet Mr. Judy, and, upon her return, did not request the Court to compel Mr. Judy to testify. The Court agreed to hold the record open until December 18 to give the parties the opportunity to take Mr. Judy's deposition. Respondent made arrangements for a deposition in Columbia within this time period, but, when advised of the scheduled deposition, petitioner stated that his father would be too ill to attend. By Order dated December 20, 1995, we expressed our concern over this "very unsatisfactory state of affairs", and admonished petitioner that

> Without a medical doctor's affidavit concerning
> Mr. Blease Judy's inability to testify, the Court is
> skeptical about such inability. The Court would be
> inclined, in the absence of Mr. Blease Judy's
> testimony, to invoke against petitioner the rule * * *
> [of] Wichita Terminal Elevator Co. v. Commissioner, 6
> T.C. 1158, 1165 (1945), affd. on other grounds 162 F.2d
> 513 (10th Cir. 1947) * * *.

We instructed petitioner either to make arrangements for the deposition of Mr. Judy by January 25, 1996, or provide the Court with "a medical doctor's affidavit explaining in detail why Mr. Blease Judy is unable to testify within that timeframe and when or whether the doctor expects that Mr. Blease Judy will be able to provide testimony in this case." In reply, petitioner

reported that the condition of Mr. Judy's health precluded a deposition. Petitioner's report was accompanied by a one-sentence note written on a doctor's prescription pad and signed by J. Richard Allison III, M.D., which read: "Pt. [patient] should be up on feet for short distance and short period of time only." In early February we discussed this matter with the parties in a telephone conference call. When we suggested a bedside deposition of Mr. Judy as an accommodation, and asked petitioner if he would be willing to bear the additional transportation costs that respondent would incur in coming to his home, petitioner was noncommittal, stating that he could probably make such arrangements but "it would take a while." Mr. Judy was not deposed. By Order dated March 29, 1996, the record was closed.

## OPINION

### 1. Unreported Income

Every taxpayer is required to maintain sufficient records to enable the Commissioner to establish the amount of his taxable income. Sec. 6001; sec. 1.6001-1(a) and (b), Income Tax Regs. If such records are lacking, the Commissioner may reconstruct the taxpayer's income by any indirect method that is reasonable under the circumstances. Cebollero v. Commissioner, 967 F.2d 986, 989 (4th Cir. 1992), affg. T.C. Memo. 1990-618; Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989); Schellenbarg v.

Commissioner, 31 T.C. 1269, 1277 (1959), affd. in part and revd. and remanded in part on another issue 283 F.2d 871 (6th Cir. 1960). Use of the source and application of funds method for reconstructing income is well accepted. Taglianetti v. United States, 398 F.2d 558, 562 (1st Cir. 1968); Cheesman v. Commissioner, T.C. Memo. 1990-350; Jones v. Commissioner, T.C. Memo. 1983-110. Under this method, any amount by which the taxpayer's applications of funds during the taxable year exceed the funds available to him from known sources is attributed to unreported taxable income. As long as respondent's use of this method to reconstruct the taxpayer's income is reasonable under the circumstances, respondent's determination is entitled to a presumption of correctness, and the taxpayer bears the burden of proving a nontaxable source of the excess funds applied. Rule 142(a); Jones v. Commissioner, supra; cf. Cebollero v. Commissioner, supra at 989-992; Estate of Mason v. Commissioner, 64 T.C. 651, 657-658 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Concessions by respondent regarding certain items in the computation of the adjustments in the statutory notice ordinarily do not shift the burden of proof to respondent. Mills v. Commissioner, 399 F.2d 744, 749 (4th Cir. 1968), affg. T.C. Memo. 1967-67; Marcello v. Commissioner, 380 F.2d 494, 497 (5th Cir. 1967), affg. in part and revg. and remanding on other issues T.C. Memo. 1964-302; Estate of Mason v. Commissioner, supra at 659.

Using the source and application of funds method, respondent determined that petitioner had unreported income from farming in addition to the receipts that respondent was able to trace to specific farm sales and that petitioner has conceded. Petitioner claims that he borrowed the amounts in controversy by making permitted withdrawals from a cash hoard of $183,000 established by his father from the proceeds of an inheritance and kept in an ammunition box under his father's bed. Petitioner's account does not persuade us, and, accordingly, we sustain respondent's revised determination.

At trial, petitioner presented no evidence to corroborate his own testimony. He did attach several documents to his posttrial brief, including the following:

(1) A statement purporting to be the affidavit of Mr. Judy, dated July 9, 1995, which confirms many of the material facts alleged by petitioner.

(2) A handwritten letter to a Mr. Paul Cumming, signed in Mr. Judy's name and dated February 1, 1995, which confirms some of the same allegations;

(3) A handwritten list of numbers adding up to $104,159.31 and bearing the title "Withdrawals from Estate";

(4) Copies of pages from four passbooks on which a few of the numbers in the aforesaid list appear in the withdrawals column;

(5)  A certified bank check in the amount of $24,806.83 payable to Mr. Judy.

None of these documents was shared with respondent before trial, introduced in evidence at trial, or brought to the attention of the Court before the record was closed.  Attachments to briefs do not constitute evidence and may not be considered. Rule 143(b); Kwong v. Commissioner, 65 T.C. 959, 967 n.11 (1976); Perkins v. Commissioner, 40 T.C. 330, 340 (1963).  None of the documents is on its face sufficiently trustworthy and probative on the point for which it is offered that excluding it would significantly detract from the truth-seeking function of these proceedings.  The first two documents are notarized by petitioner's wife.  The authenticity of Mr. Judy's signature on the documents has not been established.  The dates on the documents indicate that they were executed several months before trial.  Yet, at trial, when petitioner requested that his father be excused from testifying, he asked whether, as an alternative, Mr. Judy might be allowed to execute an affidavit while sitting in the car outside the courthouse.  That was a strange suggestion if petitioner had in fact already arranged for Mr. Judy to prepare two such affidavits.  The copies of bank records provide too little identifying information to be useful.  The account owners and depositories are not identified.  There is no indication of any relationship to the Lillie Mae Ellis estate.

The only withdrawal of funds that can be connected to Mr. Judy is in the amount of $24,806.83.

Petitioner attempts to avoid the consequences of failing to corroborate his testimony. He argues that at trial he was prepared properly to introduce in evidence bank documents establishing Mr. Judy's cash withdrawals, "but was not advised to by the Court or the Respondent at that time". "The Court was aware of these records in my possession during the November 6, 1995 Hearing, but were never asked for." What actually occurred at trial was that when petitioner adverted to certain bank records in his possession we asked him whether he had shown them to respondent. He replied that he had not. We instructed him to show his documents to respondent so that they could be included in a supplemental stipulation; under these conditions, we said, we would consider accepting them as evidence. Petitioner then qualified his offer, stating that he was unable to obtain most of the records because the banks "weren't required to keep records that far back". Petitioner did not follow the Court's suggestion. Nor was petitioner unaware of the regular procedures for the introduction of documentary evidence. He received service of the Court's Standing Pretrial Order; he participated in the preparation of a stipulation relating to joint exhibits; he had already successfully introduced two exhibits into evidence before the colloquy described above took place.

It is particularly significant that petitioner did not corroborate his account of the amounts in controversy by testimony from the person in the best position to do so. Petitioner deals with this gap in the record as follows:

> If there had been any way possible for the Petitioner's father to have testified, the contents of said "ammo-box" would not have been in question. * * *
>
> My father's testimony would prove favorable. However, due to his bad health, he wasn't able to appear for a deposition (a doctor's statement has been provided to the Court) and the Respondent told me she "didn't have the means of transportation" to our home to interview my father.

If it is peculiarly within the power of one party to produce a witness whose testimony would elucidate a transaction in controversy, the fact that he does not do so may create a presumption that the testimony would have been unfavorable. Graves v. United States, 150 U.S. 118, 121 (1893); Wynn v. United States, 397 F.2d 621, 625-626 (D.C. Cir. 1967); Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); 2 McCormick on Evidence, sec. 264, at 184-189 (4th ed. 1992). The power of a party to produce a witness may depend upon various factors, including the physical availability of the witness, his amenability to subpoena by the party, the existence of any special relationship between them, and the nature of the testimony that the witness might be expected to give. McClanahan

v. United States, 230 F.2d 919, 925-926 (5th Cir. 1956); Gaw v. Commissioner, T.C. Memo. 1995-531; 2 Wigmore on Evidence, sec. 286(a), at 199-200 (Chadbourn rev. ed. 1979).

According to petitioner's account, Mr. Judy's inheritance was the source of the amounts in controversy, and only petitioner and Mr. Judy knew that the inheritance money was secreted in an ammunition box under Mr. Judy's bed. Mr. Judy's testimony would surely have had an important, if not decisive, influence upon the resolution of the factual questions on which this case turns. Petitioner has not convinced us of Mr. Judy's inability to testify. The one-sentence note from Dr. Allison that petitioner submitted to the Court falls far short of providing the specific and detailed evaluation of this issue which the Court demanded and cannot fairly be interpreted to rule out the possibility of a deposition. Under the circumstances, Mr. Judy's availability for a deposition seems to have been largely within petitioner's control. A close relationship exists between them: They are related by blood; they live together; and throughout the negotiations between the parties and the Court on this matter petitioner has consistently purported to speak for Mr. Judy. There is ample reason to expect Mr. Judy to have cooperated with petitioner. Petitioner's suggestion that respondent is to blame for the failure to take Mr. Judy's deposition is without merit. Although respondent originally subpoenaed Mr. Judy to testify at

trial, and when this failed, attempted to arrange for his deposition, ultimately it was petitioner who bore responsibility for procuring his testimony, because petitioner bore the risk of nonpersuasion on the issue that his testimony could have elucidated.  Cf. Stoumen v. Commissioner, 208 F.2d 903, 907 (3d Cir. 1953), affg. a Memorandum Opinion of this Court.  Under these circumstances, petitioner's failure to obtain Mr. Judy's testimony certainly permits the inference that it would have been prejudicial to petitioner.

Yet, we need not rely upon such an inference in order to find in favor of respondent; the evidence and arguments presented to the Court are sufficient.[3]  Although respondent presented no evidence directly contradicting petitioner's testimony, it does not follow that petitioner has carried his burden of proof.  See Demkowicz v. Commissioner, 551 F.2d 929, 931-932 (3d Cir. 1977), revg. T.C. Memo. 1975-278; Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. T.C. Memo. 1969-159; Banks v. Commissioner, 322 F.2d 530, 537 (8th Cir. 1963), affg. in part and remanding in part T.C. Memo. 1961-237.  The credibility of petitioner's account of the amounts in controversy is weakened by the stipulated fact that he failed to report sales income for

---

[3] "The moral force of a judgment of decision will be at a maximum when * * * The judge decides the case solely on the basis of the evidence and arguments presented to him".  Fuller, The Problem of Jurisprudence 706 (Temp. ed. 1949).

each of the years at issue in at least the amounts of $16,383 and $21,698, respectively. It is further weakened by the stipulated fact that he failed to maintain adequate records of his farming operations.

Even on its own terms, petitioner's account is not satisfactory. There are unanswered questions and inconsistencies that undercut its persuasiveness. First, petitioner did not offer to explain why Mr. Judy would have preferred to withdraw the $183,000 he allegedly inherited from his sister and keep it hidden under his bed rather than leaving it in bank accounts where it could have earned interest. Such behavior is sufficient to raise doubts. Cf. Cefalu v. Commissioner, 276 F.2d 122, 127 (5th Cir. 1960), affg. T.C. Memo. 1958-37.

Second, the record discloses that petitioner obtained loans from unrelated parties during the period that he claims to have had access to interest-free funding out of his father's cash hoard. For example, in November 1990 he borrowed $31,000 from Dewey Cowart to finance the purchase of real estate. Petitioner testified that he repaid this loan by the end of that year using funds from his father's cash hoard. It is not clear why he felt he needed a short-term "bridge loan" from Dewey Cowart if he could have borrowed from the cash hoard in the first place. Several unreported income cases have noted the apparent inconsistency between borrowing from third parties and claiming

to have a cash hoard at one's disposal. Id. at 127; Peters v. Commissioner, T.C. Memo. 1981-83; Stutts v. Commissioner, T.C. Memo. 1975-298.

Third, petitioner's explanation of the circumstances under which he began using the cash hoard conflicts with other statements he made both before and during the trial. Petitioner told the Court that he sustained heavy crop losses from Hurricane Hugo in September 1989. "It destroyed our corn and soybean crop, and that is the year I started borrowing money out [of] the Ellis' estate to pay bills." But Cox testified that petitioner told him that he had borrowed funds from the Ellis inheritance to finance specific purchases of equipment in 1987 and land in 1988. Petitioner never specifically denied Cox's account of this interview. Moreover, on the morning of the trial he produced documentation showing, to the satisfaction of respondent's counsel, that he had purchased a tractor trailer in 1988 rather than in 1989, as respondent had assumed in the source and application of funds computation set forth in the notice of deficiency. He later testified that the money he used to purchase the tractor trailer came from his father's cash hoard.

Finally, petitioner has failed to give either the IRS or the Court a plausible estimate of the total amount he allegedly borrowed from the cash hoard. Cox testified that during the investigation petitioner "never would give us a specific amount

of * * * money that he had taken out of the box.  It was just every time we came up with a specific expenditure item that * * * [petitioner] had, he stated that the money came out of the ammunition box."  At trial, under cross-examination petitioner testified that he removed a total of approximately $72,000 from the ammunition box in 1990.  Yet this figure is double the amount implied by the source and application of funds computations on which petitioner and respondent agree.  On brief petitioner reproduces the results of those computations as follows:

<u>1990</u>

| | |
|---|---|
| reported income[4] | $42,229 |
| unreported income | 21,698 |
| | 63,927 |
| reported expenses | 100,590 |
| Amount I borrowed from estate funds | -36,663 |

If, as petitioner maintains, he borrowed money from his father's inheritance with the understanding that he was obligated to repay it, presumably he would have kept track of how much debt he was incurring.

Petitioner questions the plausibility of respondent's explanation for the amounts in controversy.  He asserts that, owing to severe crop damage caused by Hurricane Hugo in 1989, his

---

[4] "Reported income" is a mischaracterization.  This amount corresponds to the total available funds reported.  See the schedule set forth in our Findings of Fact.

farm could not have produced the additional income that respondent supposes he realized, and that, if his farm was producing as much income as respondent supposes, his standard of living would be considerably higher than it is. Petitioner's argument assumes facts not in evidence. He did not attempt to prove the extent of the hurricane damage he sustained. Furthermore, the sources of petitioner's farm income during the years at issue were not limited to the crops harvested in those years. He earned substantial amounts of income from sales of livestock, and Cox testified that petitioner told him that he held grain in storage, in accordance with the common practice of farmers to try to take advantage of improvements in prices over time. The inference petitioner wishes us to draw from his standard of living is a nonsequitur. The parties agree on the total amount of petitioner's expenditures during the years in issue. The question is not how much petitioner spent, but where the money came from. Respondent's determination that the source of petitioner's expenditures was unreported farm income is just as consistent with petitioner's allegedly modest standard of living as petitioner's allegation that the source was loans from his father's cash hoard.

Petitioner has not satisfied his burden of proof. We conclude that he had additional unreported income of $7,439 in 1989 and $36,663 in 1990.[5]

2. <u>Accuracy-Related Penalties</u>

Section 6662(a) and (b)(1) imposes a penalty equal to 20 percent of the portion of an underpayment of tax that is attributable to negligence or disregard of rules or regulations. "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws. Sec. 6662(c). The failure to maintain adequate records from which the taxpayer's income can be determined constitutes negligence. <u>Crocker v. Commissioner</u>, 92 T.C. 899, 917 (1989); sec. 1.6662-3(b), Income Tax Regs. The penalty does not apply to any portion of an underpayment for which the taxpayer had reasonable cause and acted in good faith. Sec. 6664(c). Petitioner bears the burden of proof. Rule 142(a).

Respondent determined that the entire underpayments for 1989 and 1990 were attributable to negligence. Petitioner has offered no argument to challenge this determination, and there is no evidence in the record that would suggest a reasonable cause for petitioner's underreporting of income and inadequate

---

[5] Petitioner's brief contains additional contentions and allegations. Although these are not discussed above, we have considered them and found them to be without merit.

recordkeeping.  Accordingly, the penalty applies to the entire amount of the underpayments.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.