Edwin Abraham v. Commissioner. Edwin Abraham and Daisy E. Abraham v. Commissioner.
Abraham v. Commissioner
Docket Nos. 76349, 76389.
United States Tax Court
T.C. Memo 1962-160; 1962 Tax Ct. Memo LEXIS 149; 21 T.C.M. (CCH) 882; T.C.M. (RIA) 62160; June 28, 1962
*149 Held: (1) Respondent's use of the net worth plus nondeductible expenditures method in reconstructing petitioners' net income for each of the years in issue was justified. (2) Petitioners realized net income in each of the years 1944 to 1953, inclusive, in excess of the amounts set forth in their income tax returns. (3) No part of the deficiency for any of the years involved was due to fraud with intent to evade tax. (4) The assessment and collection of the deficiencies and additions to tax for each of the years 1944 to 1951, inclusive, are barred by limitations. (5) Petitioners substantially underestimated their estimated taxes for each of the years 1952 and 1953, and are liable for additions to tax therefor under section 294(d)(2), I.R.C. 1939. C. E. Schindler, Esq., Kentucky Home Life Bldg., Louisville, Ky., and J. Bernard Brown, Esq., for the petitioners. Arthur Clark, Jr., Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income taxes and additions to tax as follows: Docket No. 76349
Additions to Tax,
I.R.C. 1939
Sec.
Sec. 294
Year
Deficiency
293(b)
(d)(2)
1944
$3,627.78
$1,813.89
$235.12
1945
388.48
194.24
42.75
1946
2,137.99
1,068.99
128.40
1947
3,572.16
1,786.08
244.16
1948
1,756.65
878.33
161.97
1949
2,212.48
1,135.55
213.70
1950
1,135.73
637.37
68.15
1951
4,514.93
2,257.47
302.72
Docket No. 76389
1952
$ 328.70
$ 164.35
$ 68.49
1953
1,765.38
882.69
130.10
*150 By amended answer respondent claimed increased deficiencies in income tax and in additions to tax as follows: Docket No. 76349
Additions to Tax,
I.R.C. 1939
Sec.
Sec. 294
Year
Deficiency
293(b)
(d)(2)
1945
$ 576.91
$ 288.41
$ 34.61
1948
895.28
447.64
53.71
1949
492.58
246.29
29.56
1950
471.53
235.76
28.29
Docket No. 76389
1952
$ 977.82
$ 488.91
$ 58.67
1953
227.98
113.99
13.68
Several adjustments to petitioner Edwin Abraham's net income were conceded by respondent. The issues for our determination are: (1) Whether petitioners realized net income in each of the taxable years 1944 to 1953, inclusive, in excess of the amounts set forth in their income tax returns; (2) whether any part of the deficiency for each of the years involved herein was due to fraud with intent to evade taxes; (3) whether petitioners substantially underestimated their estimated taxes for each of the years 1944 to 1953, inclusive; and (4) whether the assessment and collection of the deficiency and additions to tax for each of the years 1944 to 1951, inclusive, are barred by limitations. Findings of Fact The parties have stipulated certain facts in this case. The stipulations, including the exhibits attached thereto, are incorporated herein by this *151 reference. Petitioners, Edwin Abraham and Daisy E. Abraham, are husband and wife and reside in Louisville, Kentucky. References hereinafter made to the petitioner shall constitute a reference to Edwin Abraham unless a reference to both petitioners is clearly apparent. For each of the taxable years 1944 to 1951, inclusive, petitioner Edwin Abraham filed an individual Federal income tax return with the then collector of internal revenue for the district of Kentucky. For each of the taxable years 1952 and 1953, petitioners Edwin Abraham and Daisy E. Abraham filed a joint Federal income tax return with the district director of internal revenue for the district of Kentucky. For each of the taxable years 1944 to 1953, inclusive, petitioner disclosed income taxes due on his income tax returns, and made payments on declarations of estimated tax in the following amounts: Reported In-
Paid by
come Tax
Decla-
Year
Liability
ration
1944
$ 508.54
$ 250.00
1945
774.00
450.00
1946
502.00
500.00
1947
997.23
500.00
1948
1,542.79
600.00
1949
1,890.61
600.00
1950 * *152 2,366.72
1,000.00
1951
1,930.45
1,400.00
1952
2,983.72
2,170.98 **
1953
1,603.02
1,200.00
Petitioner's original income tax returns for all years prior to 1949 were not available; however, petitioner's retained copies of his income tax returns for the years 1941 to 1948 (later lost or destroyed) were analyzed by respondent's agent and the information contained on the first page thereof was transcribed. This information was in accord with the income tax liability disclosed by Internal Revenue Service records. Petitioner filed Federal income tax returns and paid tax thereon for the years 1920 to 1943 as follows: 1920-1925
None filed
1926
Form 1040A - Net income less than
$5,000
1927-1929
None filed
1930
Form 1040A - Net income less than
$5,000
1931-1932
None filed
1933
Nontaxable return filed
1934
Form 1040A - Net income less than
$5,000
1935
None filed
1936
Tax paid - $5.17
1937
Nontaxable return filed
1938
Form 1040A - Net income less than
$5,000
Additional assessment, $34.24
1939
Tax paid - $14.45
1940
Tax paid - $30.57
1941
Tax paid - $146.80
1942
Tax paid - $295.42
1943
Tax paid - $647.77 For the taxable years 1944 to 1953, inclusive, petitioner was *153 engaged in the practice of law. In connection with this law practice petitioner maintained a cash receipts record, a cash disbursements record, a general ledger, and a general journal. These, and other records, disclose that, during the taxable years 1944 to 1953, inclusive, petitioner received net income from his law practice, dividends and interest from his securities, and capital gains from the sale of certain securities in the following amounts: Net Business
Dividends &
Capital Gains
Year
Income
Interest
(50%)
Total
1944
$ 3,272.59
$ 179.50
$ 3,452.09
1945
3,918.04
258.00
4,176.04
1946
2,927.18
507.76
3,434.94
1947
4,745.52
1,065.07
5,806.59
1948
7,136.76
1,736.91
$ 78.88
8,873.67
1949
8,092.86
2,150.91
10,243.77
1950
8,397.11
3,083.96
300.00
11,781.07
1951
5,739.31
3,508.46
65.00
9,313.77
1952
6,908.23
4,333.54
25.00
11,266.77
1953
4,079.74
5,019.46
9,099.20
Total
$55,213.34
$21,843.57
$468.88
$77,525.79
Such income is in substantial accord with the items of income disclosed on petitioner's income tax returns for the taxable years 1944 to 1953, inclusive. The taxable net income reported by petitioner on his income tax returns for each of the taxable years 1944 to 1953, inclusive, was as follows: Taxable Net
Year
Income Reported
1944
$ 2,823.59
1945
4,176.04 * *154 1946
3,434.94 *
1947
5,306.59
1948
8,373.67
1949
9,221.03
1950
10,439.43
1951
8,381.49
1952
13,033.49
1953
8,109.04
Total
$73,299.31
An inventory was made of the petitioner's securities, both as to cost and as to dates of acquisition. According to the final settlement report filed in his mother's estate on October 31, 1942, petitioner received $3,960.77 as his one-third distributable share of the estate, a certain amount of which apparently consisted of stocks and bonds. [1]
As of December 31, 1943, petitioner owned securities in the total amount of $12,437.32. During the taxable years 1944 to 1953, inclusive, he acquired additional securities, consisting of corporate stocks, bonds and debentures, government bonds, and building and loan certificates in the following net amounts (after allowance for securities sold or exchanged): Net
Total
Year
Increase
Owned
1944
$ 1,000.63
$13,437.95
1945
2,878.55
16,316.50
1946
5,666.25
21,982.75
1947
8,787.50
30,770.25
1948
9,772.33
40,542.58
1949
8,615.13
49,157.71
1950
8,600.00
57,757.71
1951
13,410.57
71,168.28
1952
9,937.36
81,105.64
1953
9,598.03
90,703.67
Total
$78,266.35
A number of *155 the security purchases made by petitioner during the years 1947 to 1953, inclusive, were paid for by cashier's checks for which he gave the banks from which they were purchased the names of fictitious persons as the purchasers of the cashier's checks. On or about June 11, 1947, petitioner purchased 100 shares of Standard Oil of Kentucky stock through the brokerage firm of Almstedt Brothers, at a cost of $2,812.50. The purchase price was paid with a cashier's check drawn on the Lincoln Bank and Trust Company, dated June 9, 1947, payable to Almstedt Brothers in the amount of $2,812.50. The bank's records disclose that the purchaser of this check gave his name as S. S. McIntyre. Petitioner purchased the check from the bank. On or about March 18, 1948, petitioner purchased 109 shares of Belknap Hardware Company stock through Almstedt Brothers at a cost of $2,289. The purchase price was paid with a cashier's check drawn on the Lincoln Bank and Trust Company, dated March 19, 1948, payable to Almstedt Brothers in the amount of $2,289. The bank's records disclose that the purchaser of this check gave his name as Charles Jacobs. Petitioner purchased the check from the bank. On or about January *156 7, 1949, petitioner purchased 11 shares of Citizens Fidelity Bank stock through Almstedt Brothers at a cost of $1,045. The purchase price was paid with a cashier's check drawn on the Louisville Trust Company, dated January 7, 1949, payable to Almstedt Brothers in the amount of $1,045. The bank's records disclose that the purchaser of this check gave his name as Blackburn. Petitioner purchased the check from the bank. On or about August 1, 1949, petitioner purchased 15 shares of Kentucky Central Life and Accident Insurance Company stock through Almstedt Brothers at a cost of $1,230. The purchase price thereof was paid with a cashier's check drawn on the Louisville Trust Company, dated July 29, 1949, payable to Almstedt Brothers in the amount of $1,230. The bank's records disclose that the purchaser of this check gave his name as Sam Blackman. Petitioner purchased the check from the bank. On or about April 18, 1951, petitioner purchased 35 shares of Kentucky Central Life and Accident Insurance Company stock through Almstedt Brothers at a cost of $3,062.50. The purchase price was paid with a cashier's check drawn on the Lincoln Bank and Trust Company, dated April 20, 1951, payable to *157 Almstedt Brothers in the amount of $3,062.50. The bank's records disclose that the purchaser of this check gave his name as Sam Wolf. Petitioner purchased the check from the bank. On or about August 10, 1948, petitioner placed an order for the purchase of 100 shares of Ashland Oil and Refining Company stock with the stock brokerage firm of J. J. B. Hilliard and Son, Louisville, Kentucky. Petitioner paid for this stock with a cashier's check drawn on the Louisville Trust Company, dated August 16, 1948, payable to J. J. B. Hilliard and Son in the amount of $2,409.33. The bank's records disclose that the purchaser of this check gave his name as Blackburn. Petitioner purchased the check from the bank. On or about September 13, 1949, petitioner placed an order for the purchase of 100 shares of Louisville Gas and Electric Company stock with the brokerage firm of J. J. B. Hilliard and Son. Petitioner paid for this stock with a cashier's check drawn on the Louisville Trust Company, dated September 15, 1949, payable to J. J. B. Hilliard and Son in the amount of $3,037.50. The bank's records disclose that the purchaser of this check gave his name as S. Blackburn. Petitioner purchased the check *158 from the bank. On or about March 10, 1952, petitioner placed an order for the purchase of a $1,000 Matheson Company bond with the brokerage firm of Security Bond Company. Petitioner paid for this bond with a cashier's check drawn on the Lincoln Bank and Trust Company, dated March 11, 1952, payable to Security Bond Company in the amount of $1,001.68. The bank's records disclose that the purchaser of this check gave his name as Sam Blackman. Petitioner purchased the check from the bank. On or about August 19, 1953, petitioner placed an order for the purchase of a $2,000 Bruner Manufacturing Company bond with the brokerage firm of Security Bond Company. Petitioner paid for this bond with a cashier's check drawn on the Louisville Trust Company, dated August 21, 1953, payable to Security Bond Company in the amount of $2,006.33. The bank's records disclose that the purchaser of this check gave his name as Sam Blackburn. Petitioner purchased the check from the bank. In 1935 petitioner, Roy Frankenburger, and B. A. Guthrie formed a law firm under the name of Frankenburger, Abraham and Guthrie. Each of the three partners contributed capital in the amount of $2,500. Prior to 1944 petitioner *159 and B. A. Guthrie purchased Frankenburger's interest in the law firm upon the payment to Frankenburger of $2,500. On March 29, 1944, petitioner purchased B. A. Guthrie's interest in the law firm upon the following terms: A cash down payment of $500 and monthly installments of $75 until the entire purchase price of $3,000 was paid. Petitioner redeemed four $25 United States Savings Bonds, Series E, and one $500 United States Savings Bond, Series G, on March 7, 1944. Installments on petitioner's obligation to B. A. Guthrie were paid as follows: 1944
April
$ 90
May
55
June
75
July
500
August
500
September
75
October
75
November
75
December
75
Total
$1,520
1945
January
$ 75
February
75
March
75
April
75
May 10
300
May 31
75
June
75
July
75
August
75
September
80
Total
$ 980 The dissolution of partnership agreement entered into by Guthrie and petitioner includes the following language: First party is to have the exclusive ownership and right to use the firm name of Abraham & Guthrie for at least one year from the date of this Agreement and second party agrees that he will not, directly or indirectly, contact or accept business from any of the present clients of the firm and will turn his accidental contacts into the benefit of first *160 party whenever possible. Second party agrees to give such assistance as may be necessary or required to assist the first party to retain the present clients and business of the firm. Petitioner was divorced from his former wife, Louise, on November 24, 1943. During her marriage to petitioner, Louise was totally dependent upon petitioner for a livelihood. She received neither alimony nor maintenance from the petitioner by reason of divorce. Petitioner married his present wife, formerly Daisy E. Stewart, on August 7, 1952. Petitioner issued checks on his personal checking account for the years 1944 to 1953, inclusive, in the following aggregate amounts: 1944
$1,840.60
1945
2,891.77
1946
1,301.18
1947
1,657.72
1948
1,974.88
1949
2,103.51
1950
2,370.94
1951
2,069.52
1952
4,578.10
1953
6,582.30 Substantially all checks issued by petitioner on his personal account, particularly for the years 1944 to 1951, inclusive, except the checks drawn to cash, were in such amounts and payable to such persons as to suggest the payment of fixed and specific expenses, such as rent, insurance, utilities, and the like. Very few were for food or groceries. For the years 1944 to 1953, inclusive, the petitioner issued no checks *161 on his personal bank account for the payment of state and local taxes. Petitioner's total expenditures for nondeductible personal living expenses for each of the years 1944 to 1953, inclusive, were as follows: 1944
$1,840.60
1945
2,891.77
1946
1,301.18
1947
1,657.72
1948
1,974.88
1949
2,103.51
1950
2,370.94
1951
2,069.52
1952
4,578.10
1953
6,582.30
Prior to 1942 petitioner utilized for a number of years a safety deposit box which his mother had in a Harrodsburg bank. Later, and still prior to 1942, petitioner had lock boxes in Louisville. On August 12, 1942, petitioner obtained a safety deposit box at the Louisville Trust Company. He entered the box during the years 1944 to 1953, inclusive, as follows: Year
Number of Entries
1944
22
1945
23
1946
15
1947
23
1948
17
1949
16
1950
13
1951
27
1952
0
1953
0 Upon inquiry, during the investigation covering the years in question, the petitioner stated to an Internal Revenue agent that he had never made it a practice to accumulate large amounts of undeposited currency, although he had on occasion allowed dividend and interest checks to accumulate for a period of time, and that he would purchase securities with these accumulated checks. On June 17, 1942, petitioner executed and filed *162 a questionnaire with the Selective Service Administration wherein he stated under oath that his earnings during the preceding 12 months were $3,600 and that the value of his property was $3,000. Petitioner was born October 7, 1900. His father operated a grocery store in the town of Harrodsburg, Kentucky, a rural central Kentucky town. Petitioner was employed in the store from sometime before 1916 and until 1917 as a part-time clerk and delivery boy while he attended grade and high school. From 1917 to September 1919 he was employed by an attorney in Harrodsburg as a law clerk, investigator, and stenographer, and at the same time had part-time employment as an assistant to the clerk of the Mercer Circuit Court in Harrodsburg. Petitioner was enrolled in the University of Kentucky Law School from September 1919 to September 1920, and while in attendance at the University worked part-time for a life insurance company and also was employed part-time at a Lexington department store. In 1920 petitioner went to Louisville, where he worked as an office assistant while attending Jefferson School of Law at night. During 1922, 1923, and 1924 he was a deputy clerk of the Jefferson Circuit Court *163 in Louisville. He was admitted to practice law in 1923. In 1925, 1926, and 1927 petitioner worked as an assistant to a Louisville attorney. In 1928 he was employed in Detroit, Michigan, as an office assistant by a real estate firm. In 1929 and 1930 he was a law clerk and office assistant for a Louisville law firm. In 1931, 1932, 1933, and 1934 he was in partnership with Kenneth H. Adams. Petitioner and his partner were general attorneys for United Mercantile Agencies during that period. In 1935 petitioner entered into partnership with Roy Frankenburger and B. A. Guthrie. Frankenburger withdrew shortly after 1935. Petitioner and Guthrie continued in partnership through March 1944, when Guthrie sold his interest in the partnership to petitioner. The respondent reconstructed petitioner's net income by analyzing the increases in his net worth and his nondeductible personal expenditures. The following net worth computation reflects the petitioner's correct net income for the taxable years 1944 to 1953, inclusive, and the amounts by which he understated his true net income in his income tax returns for such years: 1943
1944
1945
ASSETS
(a) Undeposited Currency on Hand
$0
$0
$0
(b) Bank Accounts
(1) Liberty National Bank
364.36
2,132.40
1,567.40
(2) Louisville Trust Co.
0
0
319.94
(3) First National Bank
1,247.28
2,027.08
1,811.24
(c) Securities
12,437.32
13,437.95
16,316.50
(d) Investment - Abraham & Guthrie
3,750.00
5,770.00
6,750.00
(e) Office Furniture & Fixtures
2,207.24
2,207.24
2,207.24
(f) Law Library
1,613.15
1,633.15
1,633.15
TOTAL ASSETS
$21,619.35
$27,207.82
$30,605.47
LIABILITIES
Reserves for Depreciation
(g) Office Furniture & Fixtures
$ 686.25
$ 796.05
$ 905.85
(h) Law Library
345.00
400.20
455.40
TOTAL LIABILITIES
$ 1,031.25
$ 1,196.25
$ 1,361.25
NET WORTH
$20,588.10
$26,011.57
$29,244.22
Prior Year Net Worth
20,588.10
26,011.57
Increase
5,423.47
3,232.65
ADD: (i) Personal Life Insurance Premiums Paid
600.00
600.00
(j) Federal Income Taxes Paid
444.11
321.04
(k) Personal Living Expenses (Cash &
Check)
1,840.60
2,891.77
Nontaxable Portion of Long Term Capital
Gains
Adjusted Gross Income
$ 8,308.18
$ 7,045.46
Standard Deduction
500.00
500.00
Net Income
7,808.18
6,545.46
Net Income Reported
2,823.59
4,176.04 *
Understatement of net income
4,984.59
2,869.42 **
*164 1946
1947
1948
ASSETS
(a) Undeposited Currency on Hand
$0
$0
$0
(b) Bank Accounts
(1) Liberty National Bank
1,318.35
1,409.75
919.14
(2) Louisville Trust Co.
331.07
326.90
322.74
(3) First National Bank
1,492.81
2,898.66
5,080.60
(c) Securities
21,982.75
30,770.25
40,542.58
(d) Investment - Abraham & Guthrie
6,750.00
6,750.00
6,750.00
(e) Office Furniture & Fixtures
2,207.24
2,242.24
2,273.39
(f) Law Library
1,633.15
1,774.15
2,081.65
TOTAL ASSETS
$35,715.37
$46,171.95
$57,970.10
LIABILITIES
Reserves for Depreciation
(g) Office Furniture & Fixtures
$ 1,015.65
$ 1,125.45
$ 1,235.25
(h) Law Library
510.60
565.80
621.00
TOTAL LIABILITIES
$ 1,526.25
$ 1,691.25
$ 1,856.25
NET WORTH
$34,189.12
$44,480.70
$56,113.85
Prior Year Net Worth
29,244.22
34,189.12
44,480.70
Increase
4,944.90
10,291.58
11,633.15
ADD: (i) Personal Life Insurance Premiums Paid
600.00
600.00
600.00
(j) Federal Income Taxes Paid
1,006.35
542.01
1,072.23
(k) Personal Living Expenses (Cash &
Check)
1,301.18
1,657.72
1,974.88
Nontaxable Portion of Long Term Capital
Gains
(78.88)
Adjusted Gross Income
$ 7,852.43
$13,091.31
$15,201.38
Standard Deduction
500.00
500.00
1,000.00
Net Income
7,352.43
12,591.31
14,201.38
Net Income Reported
3,434.94 *
5,306.59
8,373.67
Understatement of net income
4,417.49 **
7,284.72
5,827.71
1949
1950
1951
ASSETS
(a) Undeposited Currency on Hand
$0
$0
$0
(b) Bank Accounts
(1) Liberty National Bank
2,299.75
3,012.24
3,270.92
(2) Louisville Trust Co.
283.17
279.98
340.03
(3) First National Bank
7,031.39
7,910.37
3,704.14
(c) Securities
49,157.71
57,757.71
71,168.28
(d) Investment - Abraham & Guthrie
6,750.00
6,750.00
6,750.00
(e) Office Furniture & Fixtures
2,273.39
2,379.44
2,317.84
(f) Law Library
2,370.25
2,370.25
2,809.35
TOTAL ASSETS
$70,165.66
$80,459.99
$90,360.56
LIABILITIES
Reserves for Depreciation
(g) Office Furniture & Fixtures
$ 1,345.05
$ 1,454.85
$ 1,926.11
(h) Law Library
676.20
731.40
1,623.07
TOTAL LIABILITIES
$ 2,021.25
$ 2,186.25
$ 3,549.18
NET WORTH
$68,144.41
$78,273.74
$86,811.38
Prior Year Net Worth
56,113.85
68,144.41
78,273.74
Increase
12,030.56
10,129.33
8,537.64
ADD: (i) Personal Life Insurance Premiums Paid
600.00
600.00
600.00
(j) Federal Income Taxes Paid
1,692.79
1,890.61
2,636.72
(k) Personal Living Expenses (Cash &
Check)
2,103.51
2,370.94
2,069.52
Nontaxable Portion of Long Term Capital
Gains
(300.00)
(65.00)
Adjusted Gross Income
$16,426.86
$14,690.88
$13,778.88
Standard Deduction
1,000.00
1,000.00
1,000.00
Net Income
15,426.86
13,690.88
12,778.88
Net Income Reported
9,221.03
10,439.43
8,381.49
Understatement of net income
6,205.83
3,251.45
4,397.31
*165 1952
1953
ASSETS
(a) Undeposited Currency on Hand
$0
$0
(b) Bank Accounts
(1) Liberty National Bank
2,951.25
981.07
(2) Louisville Trust Co.
275.09
331.57
(3) First National Bank
3,157.55
1,056.54
(c) Securities
81,105.64
90,703.67
(d) Investment - Abraham & Guthrie
6,750.00
6,750.00
(e) Office Furniture & Fixtures
2,317.84
2,317.84
(f) Law Library
3,016.45
3,149.95
TOTAL ASSETS
$99,573.82
$105,290.64
LIABILITIES
Reserves for Depreciation
(g) Office Furniture & Fixtures
$ 2,066.12
$ 2,112.53
(h) Law Library
1,811.03
1,942.83
TOTAL LIABILITIES
$ 3,877.15
$ 4,055.36
NET WORTH
$95,696.67
$101,235.28
Prior Year Net Worth
86,811.38
95,696.67
Increase
8,885.29
5,538.61
ADD: (i) Personal Life Insurance Premiums Paid
600.00
600.00
(j) Federal Income Taxes Paid
2,899.04
2,212.74
(k) Personal Living Expenses (Cash &
Check)
4,578.10
6,582.30
Nontaxable Portion of Long Term Capital
Gains
(25.00)
Adjusted Gross Income
$16,937.43
$14,933.65
Standard Deduction
1,000.00
1,000.00
Net Income
15,937.43
13,933.65
Net Income Reported
13,033.49
8,109.04
Understatement of net income
2,903.94
5,824.61 Opinion Respondent determined deficiencies in the income taxes of the petitioners for each of the years 1944 to 1953, *166 inclusive, by use of the net worth plus personal expenditures method. Petitioners have the burden of overcoming the presumptive correctness of respondent's determination. On the other hand, respondent has the burden with respect to the issues relating to fraud and limitation, as well as the claim for increased deficiencies and additions to tax presented by the affirmative allegations of his answer and amended answer. Petitioners challenge the appropriateness of respondent's use of the net worth method on the ground that their taxable income is correctly reflected by the books and records which the petitioner, Edwin Abraham, kept of his law practice and of the dividends, interest and capital gains received by him from his investments, and that the returns filed by him for the years in question are in substantial accord with such books and records. It is recognized that the net worth method is not itself a system of accounting but merely a technique for reconstructing a taxpayer's correct net income, regardless of the method of accounting followed by the taxpayer. By a showing of substantial increase in net worth in excess of reported income, without reasonable explanation of such discrepancy, *167 the net worth method furnishes persuasive evidence of unreported income and reflects on the over-all accuracy of income reported on the books and on the returns. Michael Potson, 22 T.C. 912, affd. sub nom. Bodoglau v. Commissioner, 230 F. 2d 336; Estate of George L. Cury, 23 T.C. 305; Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871, certiorari denied 350 U.S. 845; H. A. Hurley, 22 T.C. 1256, affd. 233 F. 2d 177; Harry Gleis, 24 T.C. 941, affd. 245 F. 2d 237. Thus, even where the books and records of a taxpayer appear on their face to be adequate, respondent is not precluded from using the net worth method. Davis v. Commissioner, 239 F. 2d 187, affirming a Memorandum Opinion of this Court. As suggested by the Supreme Court in Holland v. United States, 348 U.S. 121, rehearing denied 348 U.S. 932, books and records may be "more consistent than truthful." During the years 1944 to 1953, inclusive, the aggregate increase in securities purchased by petitioner exceeded both the aggregate income shown on his books and records and the aggregate net taxable income reported on his returns. When consideration is given to his personal and living expenses, the disparities, and *168 consequently the increases in petitioner's net worth requiring explanation, are considerably greater. These circumstances alone are sufficient to require our rejection of petitioner's contention with respect to the propriety of respondent's use of the net worth method. As we understand petitioner's position, aside from the contention that the net worth method should not be used at all, he does not question any of the items of respondent's net worth analysis, except: (a) The amount of undeposited currency on hand at the beginning of the net worth period and each of the years involved; (d) his investment in Abraham & Guthrie; and (k) his personal living expenses. The amounts shown in his bank accounts and securities purchased during each of the taxable years, as well as the items relating to his office equipment and law library, including the reserves for depreciation thereof, have been stipulated. Premiums paid on his personal life insurance and Federal income taxes paid have also been stipulated. Cash on Hand Petitioner contends that he had cash on hand at the end of 1943 and consequently at the beginning of 1944 in the amount of $47,800, and that this cash was kept by him in a safety *169 deposit box. He has placed in evidence a statement of securities purchased and sold during the period January 1, 1944, through December 31, 1953, and purporting to show how various amounts of the $47,800 alleged to have been on hand at the beginning of the period were used to supplement income received from dividends and interest and the proceeds from the sales of securities, to purchase other securities or to make deposits in his bank accounts. Thus, he claims to have had cash on hand at the end of the years involved as follows: End of Year
Cash on Hand
1943
$47,800.00
1944
47,651.66
1945
46,232.19
1946
41,649.70
1947
34,577.27
1948
27,104.61
1949
21,965.39
1950
18,983.85
1951
11,758.92
1952
7,537.78
1953
2,309.21
Assuming that petitioner did have, undeposited in any bank account as of January 1, 1944, cash on hand in the amount of $47,800, as claimed by him, the source of the net worth increases shown in the net worth statement over the years in question would be substantially explained. The trouble is that we are not convinced by the uncorroborated testimony of petitioner that he received the amounts he claims to have earned over the period from 1916 to 1943, inclusive, or that he was able to save or had *170 on hand the amount of cash he claims to have had at the beginning of January 1944. He testified that from sometime before 1916 to 1917, while attending grade and high school, he worked part-time as a clerk and errand boy in a grocery store operated by his father in Harrodsburg, Kentucky, for which he was paid $100 a month. From 1917 to September 1919, he testified he received $250 a month while acting as a "law clerk," investigator, and stenographer for an attorney in Harrodsburg and as a part-time assistant to the clerk of the Mercer Circuit Court in Harrodsburg. Harrodsburg is a relatively small town located in a rural community in central Kentucky. According to the Bureau of the Census it had a population of 3,147 in 1910 and 3,765 in 1920. Without corroboration thereof, we are not convinced that petitioner's father paid him the amount he claims. We also take note of the fact that the Mercer Circuit Court is not a court of continuous session; that the constitution and the statutes of Kentucky require only three regular terms a year for periods of 18 to 24 juridical days each, if business so requires; and that it is presided over by a circuit judge who also presides over circuit *171 courts in three other counties holding a similar number of terms. K.R.S. (1946), § 23.050. Without corroboration we are not convinced petitioner received $250 per month from an attorney and the clerk of the Mercer Circuit Court during the period indicated. From September 1919 to September 1920, while attending the University of Kentucky Law School in Lexington, Kentucky, petitioner claims he received $150 a month for part-time employment by a life insurance company and by a department store. During the next two years he claims he earned $200 a month as an office assistant while attending night sessions of the Jefferson School of Law in Louisville, Kentucky, and that during 1922, 1923, and 1924, he earned $200 a month as a deputy clerk of the Jefferson Circuit Court in Louisville. Without corroboration, we are not convinced that petitioner received the amounts he claims to have received from any of such employment. Petitioner was admitted to the bar of Kentucky in the fall of 1923. During 1925, 1926, and 1927, he says he was employed as an assistant to a Louisville attorney, by whom he was paid $400 a month; that in 1928 he was employed as an office assistant in Detroit, Michigan, for *172 which he received $400 per month; and that in 1929 and 1930, he earned $400 a month as an attorney and law clerk in a Louisville office. In 1931, 1932, 1933, and 1934, he was in partnership with Kenneth H. Adams, during which he claims he earned $400 a month. In 1935, petitioner entered into a partnership with Roy Frankenburger and B. A. Guthrie. Frankenburger withdrew shortly after 1935 and petitioner and Guthrie continued the partnership until March 1944. For the years 1935 to 1943, inclusive, petitioner claims he earned $500 per month. Petitioner offered no corroborating testimony or other evidence as to the amounts claimed to have been earned or received by him during the years 1925 to 1943, inclusive, nor has he offered any explanation of his failure to produce such testimony or other evidence. In the absence of some corroborating evidence we are not convinced that petitioner received the amounts he claims to have received during such years. Aside from the unrealities which we consider inherent in his testimony concerning his prior earnings, petitioner's disregard for the facts in the statements contained in the questionnaire filed with the Selective Service Administration in *173 1942, as well as his use of assumed or fictitious names in the procurement of cashier's checks in 1947 to 1953, inclusive (although the reason therefor is not clear), causes us to question the accuracy of his testimony regarding his prior earnings and accumulations. We are satisfied petitioner has been industrious, thrifty, and saving. He has not established to our satisfaction, however, that he had accumulated $47,800 over and above the $21,619.35 which he had at the end of 1943 in bank accounts, securities, and the investment in his law office. Moreover, petitioner's claim that he had a cash hoard in the amount of $47,800 as of the end of 1943 is contrary to his statement to the revenue agent that he never made it a practice to accumulate large amounts of undeposited currency. His method of paying for the interest of his law partnership in Abraham & Guthrie over a period of two years in 1944 and 1945, is likewise inconsistent with the claimed possession of a cash hoard in the amount of $47,800 at that time. While we do not question that he had some cash on hand, we are satisfied it was inconsequential in amount and remained substantially constant over the years involved and consequently *174 the exact amount is immaterial to the issue here being considered. Investment in Abraham & Guthrie Petitioner contends that his net worth should not be increased by the payments for his partner's interest in the firm of Abraham & Guthrie. Petitioner, Frankenburger and Guthrie formed a law partnership in 1935, each of the three partners contributing capital in the amount of $2,500. Shortly thereafter, and prior to 1944, Frankenburger withdrew and petitioner and Guthrie paid him $2,500 for his interest. In 1944, petitioner purchased Guthrie's interest for a total consideration of $3,000, payable $500 down and $75 per month until the total purchase price had been paid. In addition to the $500 down payment petitioner made payments aggregating $1,520 in 1944 and $980 in 1945. Thus, as of the beginning of 1944, petitioner had $3,750 invested in the firm; at the end of 1944 he had $5,770 invested; and at the end of 1945, he had $6,750 capital invested in the firm. Thereafter his interest remained the same throughout the years in question. We find no merit in petitioner's contention regarding this issue. Personal Living Expenditures The question here presented is one of fact and is disposed *175 of by our findings. At the trial petitioner produced schedules of checks drawn by him on his personal checking accounts during each of the years 1944 to 1953, inclusive, and contends that these represent the extent of his personal living expenses. We have carefully considered each of these schedules. Most of the checks for the years 1944 to 1951, inclusive, are readily identifiable as payments for insurance, rent, telephone, utilities, medical, clothing, and like expenses. Very few appear to be for food or groceries, and we have serious doubts that the checks written for cash in several of these years were sufficient to have satisfied petitioner's requirements for food and incidental expenses. In view of our conclusion (hereinafter discussed), however, that each of the years 1944 to 1951, inclusive, is barred by limitations, we do not consider it material or necessary to make more realistic findings with respect to petitioner's living expenses for the years 1944 to 1951, inclusive. With respect to the years 1952 and 1953, the schedules show that petitioner wrote checks for cash in the amount of $1,180 for 1952 and $1,300.10 for 1953, and that, in addition he wrote checks payable to *176 his wife in the amount of $389.35 in 1952 and $1,124.98 for 1953. Accordingly, we have found that petitioner's living expenses (by check and cash) for each of the taxable years involved were in accordance with petitioner's contention. In view of our conclusion regarding the above three items and the stipulated facts, it is apparent that petitioner had unreported income in each of the taxable years in question in the amounts set forth in the net worth computation included in our findings. Fraud Having found that petitioner had unreported income in each of the years in question, the next question for our consideration is whether any part of the deficiencies resulting therefrom is due to fraud with intent to evade tax (section 293(b), Internal Revenue Code of 1939) and whether the returns filed for those years were false or fraudulent with intent to evade tax (section 276(a), Internal Revenue Code of 1939). The respondent bears the burden of proving the requisite fraud and the evidence must be clear and convincing. The fact that respondent has determined a greater tax liability than reported and such determination is sustained does not of itself establish fraud. An intent or purpose *177 to evade tax is essential. Estate of Louis L. Briden, 11 T.C. 1095, 1132, affd. sub nom. Kirk v. Commissioner, 179 F. 2d 619; Harold B. Franklin, 34 B.T.A. 927, 935; James Nicholson, 32 B.T.A. 977, affd. 90 F. 2d 978. In the more recent case of Drieborg v. Commissioner, 225 F. 2d 216, affirming in part and reversing in part a Memorandum Opinion of this Court, it was said: At the outset it should be emphasized that the failure of the taxpayers to overcome the presumptive correctness of the deficiencies, even though those deficiencies cover a consecutive ten year period, cannot be regarded, in and of itself, as sufficient proof that the deficiencies or any part thereof were due to fraud on the part of the taxpayers. To hold otherwise would be to ignore the statute which imposes on the Commissioner the burden of proving fraud, and the often repeated admoniion that such proof must be by clear and convincing evidence. Wiseley v. Commissioner, 6 Cir., 1950, 185 F. 2d 263; Rogers v. Commissioner, 6 Cir., 1940, 111 F. 2d 987, 989; Mitchell v. Commissioner, 5 Cir., 1941, 118 F. 2d 308. There must be additional independent evidence from which fraudulent intent on the part of the *178 taxpayer can be properly inferred. * * * That the difference in the burden of proving ordinary tax deficiencies and civil fraud can have important practical results has long been recognized. "As to theissue raised by [the Commissioner's] determination of fraud the burden is upon him; and he may fail to sustain such burden, notwithstanding the determined and presumed error in the return. In other words, both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalty set aside." L. Schepp Co., 1932, 25 B.T.A. 419, 437. * * * It is recognized that the consistent and substantial understatement of income over a period of years may constitute clear and convincing evidence of fraud. Holland v. United States, supra. However, where the understatement of income is established only by reason of petitioner's failure to sustain his burden of overcoming the presumptive correctness of respondent's determination based upon the net worth method, there must be some additional independent evidence from which fraudulent intent can be properly inferred. Drieborg v. Commissioner, supra. We do not find such evidence in the record. Respondent *179 has not established a single specific instance where income received by petitioner from his law practice or from his investments was omitted from income reported. The fact that we have not seen fit to accept as true petitioner's claims regarding cash on hand at the beginning of the net worth period where the burden of proof was on petitioner, does not relieve respondent of his burden of negativing such claims and that the increases in net worth did not result from nontaxable sources. Neither side offered the testimony or records of any witness to corroborate or refute petitioner's claims regarding his former employment. On the record presented, we hold that the respondent has failed to establish by clear and convincing evidence that any part of the deficiency for any of the years involved was due to fraud with intent to evade tax. Accordingly, petitioner is not liable for any additions to tax under the provisions of section 293(b) of the Internal Revenue Code of 1939 for any of the years in issue. It necessarily follows from what we have said that respondent has not established that the returns filed by petitioners for the years 1944 to 1951, inclusive, were false or fraudulent with *180 intent to evade tax within the meaning of section 276(a) of the Internal Revenue Code of 1939 and the assessment and collection of the deficiencies and additions to tax for the years 1944 to 1951, inclusive, are barred by limitations. The remaining issue is whether petitioners are liable for additions to tax under section 294(d)(2)[2] *181 for substantial underestimate of estimated taxes for each of the years 1952 and 1953. In view of our conclusion that the years 1944 to 1951, inclusive, are barred by limitations, we need not consider those years. Petitioner offered no evidence in connection with this issue but, on brief, contends that he is not liable for any additions to tax under section 294(d)(2) for any of the years in issue. He complains that respondent has computed the additions to tax on the basis of the tax liabilities shown by the net worth computation and that he has not taken into consideration the amount of taxes shown on his returns for the preceding years. Petitioner's complaint involves two distinct facets of the problem with which we are concerned; the one having to do with the amount of the additions in the *182 event liability is established, and the other having to do with liability in the first instance. Contrary to petitioner's contentions, it is well settled that a substantial underestimate of estimated tax has occurred if 80 percent of the taxpayer's actual tax liability exceeds his estimated tax. DeWitt M. Sherwood, 20 T.C. 733; H. R. Smith, 20 T.C. 663; Craig M. Smith, 33 T.C. 465, 489 (on appeal C.A. 8). Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), modifying a Memorandum Opinion of this Court, which is relied upon by the petitioner, dealt with the facet relating to liability. In the Schwarzkopf case the court held that the taxpayer was not liable for additions to tax because he had made timely payments of estimated tax greater than the amounts of tax shown on his returns for the proceding years. Stated another way, the taxpayer had, in fact, underestimated his estimated taxes but was not liable for the additions to tax because he came within an exception precluding the Commissioner from determining the additions. See also Herbert Schellenbarg, 31 T.C. 1269, 1279. In the instant case petitioner estimated his tax liability for the year 1953 to be in the amount of *183 $1,200. His reported tax liability for 1953 was $1,603.02. Accordingly his estimated tax was less than 80 percent of his reported tax liability and also less than the taxes reported and paid by him for the preceding year, as well as the amount for which he is liable under the reconstruction. He is clearly liable for additions to tax under section 294(d)(2) for the year 1953. For the year 1952 petitioners paid on declaration and by way of withholdings from Daisy's earnings, a total of $2,170.98. This amount is less than 80 percent of the tax liability ($2,983.72) reported and paid by petitioners for that year. It is, however, more than the amount of tax ($1,930.45) paid by petitioner Edwin Abraham for the preceding year. Of the $2,170.98 paid for 1952, however, $470.98 represented taxes withheld from the earnings of Daisy, leaving only $1,700 paid on the declaration of estimated taxes by petitioner Edwin Abraham. Thus, the estimated tax payments made by Edwin Abraham in 1952 were less than the $1,930.45 income taxes reported and paid by him for 1951. Since Edwin Abraham was not married and had no dependents as of the date of filing the estimated tax declaration in 1952, his payments *184 in 1952, taken alone, do not bring him within the exception provided by section 294(d)(2) and referred to in Schwarzkopf v. Commissioner, supra.The language of the statute refers to the taxpayer and his return for the prior year. Assuming that the withholdings from Daisy's earnings for 1952 are to be taken into account, it is evident that her reported income taxes for 1951 must also be taken into account. The record contains no evidence of the amount of taxes reported or paid by Daisy for 1951. It is accordingly held that petitioners are liable for additions to taxes under section 294(d)(2) for the years 1952 and 1953, in such amounts as the computation under Rule 50 reveals that 80 percent of the actual tax liability, as determined herein, exceeds the estimated taxes for such years. Decisions will be entered under Rule 50. Footnotes
*. Certain adjustments were made in connection with an examination of petitioner's income taxes for the year 1950 in a prior audit. The additional tax paid is not reflected in this schedule. **. Includes $470.98 in tax withheld from Daisy's earnings.↩
*. Adjusted gross income.
1. Petitioner testified he received $5,111.13, of which $346.13 was cash and the remainder consisted of stocks and bonds. Some of the securities listed by him do not appear in the appraisal report filed for the estate.↩
*. Adjusted gross income. ↩
**. Computed from correct adjusted gross income.↩
2. SEC. 294. ADDITIONS TO THE TAX INCASE OF NONPAYMENT. * * *
(d) Estimated Tax. - * * *
(2) Substantial Understimate of Estimated Tax. - If 80 percentum of the tax (determined without regard to the credits under sections 32 and 35), * * * exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter (excluding, in case the taxable year begins in 1943, any quarter beginning prior to July 1, 1943) of such year * * * in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year * * * but otherwise on the basis of the facts shown on his return for the preceding taxable year. * * *