A. L. BURSTEIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burstein v. Commissioner
Docket No. 763-72.
United States Tax Court
T.C. Memo 1976-68; 1976 Tax Ct. Memo LEXIS 329; 35 T.C.M. (CCH) 296; T.C.M. (RIA) 760068; March 9, 1976, Filed A. Lincoln Burstein, pro se. Howard W. Gordon, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Additions to tax Year
Income tax
Sec. 6651(a) [1]
Sec. 6653(a)
Sec. 6654
1962
$5,872.35
$1,468.09
$293.62
$ 158.11
1963
4,507.41
1,126.85
225.37
118.95
1964
1,140.96
285.24
57.05
24.69 The issues presented for our consideration are: (1) whether petitioner had unreported income for 1962, 1963, and 1964 and whether respondent properly reconstructed the amounts of such income; (2) whether *331 petitioner was entitled to certain deductions for the taxable years in question; (3) whether petitioner is entitled to certain dependency exemptions for the taxable year 1962; and (4) whether petitioner is liable for additions to tax under sections 6651(a), 6653(a), and 6654. The stipulation of facts filed by the parties is incorporated herein by this reference. Petitioner, A. L. Burstein, a resident of Philadelphia, Pennsylvania, at the time of filing the petition herein, failed to file timely income tax returns for the taxable years 1962, 1963, and 1964. On June 15, 1973, long after receiving respondent's notice of deficiency for those years and after filing a petition in this Court, petitioner filed late returns for the years 1962 and 1963 with the district director of internal revenue, Philadelphia, Pennsylvania. In each of these late returns, petitioner stated his occupation to be that of a builder and reported no tax liability. Petitioner is a graduate of the University of Pennsylvania and the University of Pennsylvania Law School. He has been a member of the bar and a practicing attorney in Pennsylvania since 1930. For a number of years, including those in question, petitioner *332 was involved in various real estate dealings. He also acted as an arbitrator. The Court has been presented with a most difficult task in analyzing the record herein. Petitioner represented himself and, although an attorney, made no real effort to present his evidence in an orderly fashion despite the fact that the Court afforded him ample opportunity so to do. We have done the best we could under the circumstances, keeping in mind that the petitioner has the burden of proof under Rule 142, Rules of Practice and Procedure of this Court. Against this background, we think it most useful to begin our analysis with the outline of the manner in which the respondent computed the underlying deficiencies and respondent's subsequent concessions on brief, before discussing the particular matters at issue. Respondent determined that petitioner had unreported income for the years in issue and attempted to reconstruct the amount of such income. Because petitioner had not maintained adequate books and records, respondent employed a combination of methods of income reconstruction, whereby an income figure for each year was arrived at by adding unexplained bank deposits [2] into accounts maintained *333 by the taxpayer, estimated annual cash expenses incurred by the taxpayer, and specific income items. [3] Since petitioner deposited money into the account of his wholly-owned corporation (Sulinc) as well as into his personal bank accounts, respondent included as unexplained deposits income those deposits to the Sulinc account which were not attributable to sources other than the petitioner and were not made by checks drawn on petitioner's personal accounts. Thus, respondent found petitioner's income as follows: Year
1962
1963
1964
Gross income
Attorney account
deposits
$7,051.82
$6,416.94
$3,428.73
Sulinc account
deposits
9,593.38
708.13
Crusader account
deposits
500.00
Personal account
deposits
610.00
Interest
33.91
20.72
Cash expenditures
1,500.00
1,500.00
1,500.00
Other
4,862.42 [1]
350.13 3[3]
2,250.00 [2]
Less
Depreciation
(185.62)
(185.62)
(185.62)
Standard
deduction
(1,000.00)
(1,000.00)
(500.00) [4] *334 Exemption
(600.00)
(600.00)
(600.00)
Taxable income
$16,893.49
$13,972.59
$4,603.24
In the stipulation of facts, petitioner concedes that he received $650.00 in income in 1962 from one John Herman; this amount was not included in the statutory notice of deficiency. Petitioner also concedes that in 1963 he received $20.52 of the interest charged to him in the statutory notice of deficiency for 1962. [4]
In the *335 stipulation of facts, respondent concedes that the following deposits charged to petitioner in the statutory notice of deficiency came from nontaxable sources: 1962
1963
1964
Attorney account
$1,550.00
$1,800.00
$500.00
Sulinc account
973.88
135.13
Crusader account
500.00 [1]
Respondent also concedes on brief that petitioner had Schedule C expenses not allowed in the deficiency notice as follows: Year
Amount
1962
$2,122.38
1963
1,477.00
Respondent also concedes on brief that $1,418.05 of unexplained bank deposits in 1964 determined to be ordinary income in the statutory notice of deficiency represented a distribution to petitioner in liquidation of DAB Real Estate & Service Company (hereinafter DAB). Respondent contends that this amount constitutes long-term *336 capital gain to petitioner (before the section 1202 deduction) on the ground that petitioner had a zero basis in the stock. Leaving aside for the moment the question of the separateness of DAB as a corporate entity (see pp. 12-14, infra), we think that respondent's treatment of this item is correct. While the evidence is meager, we think it enough to indicate that petitioner had a zero basis, [5] even if we were to consider this item to constitute a new issue, thereby placing the burden of proof on respondent (which, in point of fact, we do not believe to be the case). *337 In the statutory notice of deficiency, respondent determined that in 1963, on the liquidation of Sulinc, petitioner had long-term capital gain (prior to the section 1202 deduction) of $9,724.81, computed on the basis of gross proceeds of $19,652.18 and a cost basis in Sulinc stock of $9,927.37. Respondent on brief concedes that petitioner's cost basis should be at least $10,513.98, with the result that the aforesaid long-term capital gain should be $9,138.20. Petitioner has furnished no evidence to dispute respondent's figures, so that, aside from the issue of whether Sulinc was a separate entity (see p. 17, infra), we accept respondent's determination. In light of the foregoing, respondent's revised computation of petitioner's gross income and deductions and exemptions is as follows: 1962
1963
1964
Gross income
Attorney account
$ 5,501.82
$ 4,616.94
$1,510.68
Sulinc account
8,619.50
573.00
Personal account
610.00
Interest
20.52 [1]
Cash expenditures
1,500.00
1,500.00
1,500.00
Other
650.00 [2]
6,819.10 [3]
1,059.15 [4]
Total
$16,271.32 [5]
$13,529.56 [6]
$4,679.83 [7]
Less
Depreciation
$ 185.62
$ 185.62
$ 185.62
Other Schedule C
deductions
2,122.38
1,477.00
Total
$ 2,308.00 [8]
$ 1,662.62
$ 185.62
Adjusted gross
income
$13,963.32
$11,866.94
$4,494.21
Standard deduction
(1,000.00)
(1,000.00)
(449.42) [9]
Exemption
(600.00)
(600.00)
(600.00)
Taxable income
$12,363.32
$10,266.94
$3,444.79
*338 *339 Having thus delineated the parameters of the instant case, we turn to the specific issues which require analysis. Method of Reconstruction
Section 6001 and the regulations promulgated thereunder require a taxpayer to maintain appropriate books and records. Where a taxpayer has failed to meet this obligation, the Commissioner has the right to determine such taxpayer's income by another method. H. A. Hurley,22 T.C. 1256, 1261 (1954), affd. per curiam 233 F. 2d 177 (6th Cir. 1956). See generally, 2 Mertens, Law of Federal Income Taxation, sec. 12.12 (Malone rev. 1974). The Commissioner is not limited in his choice of reconstruction methods. [6] See Herbert Schellenbarg,31 T.C. 1269, 1277 (1959). [7] It is clear that the Commissioner's reliance on a combination of bank deposits, cash expenditures, and specific items is proper. See Doll v. Glenn,231 F. 2d 186, 188 (6th Cir. 1956), and cases cited therein. Thus, petitioner has the burden of proving such determination erroneous. Ibid.
*340 As the record herein clearly indicates, petitioner's records were inadequate. Petitioner, however, contests the respondent's choice of the bank deposits method of reconstruction as arbitrary and contests respondent's calculations under that method for want of a computation of opening net worth. Petitioner's arguments are lacking in merit. While it is true that a taxpayer might shift the burden of proof to respondent if he were to show that respondent's determination that certain bank deposits represent income was "speculative and arbitrary" ( Goe v. Commissioner,198 F. 2d 851, 852 (3d Cir. 1952); Human Engineering Institute,61 T.C. 61, 66 (1973)), petitioner has offered no proof that this was the case. There is no need for a net worth statement under the bank deposits method. Price v. United States,335 F. 2d 671, 677 (5th Cir. 1964). It may be fairly inferred that unexplained bank deposits are items of income. Goe v. Commissioner,supra.
DAB Distribution
Petitioner takes the position that the DAB distribution *341 constitutes an inheritance from his father (who died in 1957) and is, therefore, exempt from income taxation. Since petitioner's father was the sole shareholder of DAB until his death, petitioner would have us view the distribution of DAB assets as a distribution directly from his father's estate. Petitioner urges us to find as a fact that he was not a shareholder of DAB and that, after his father's death, he merely served as a "nominal officer * * * to meet state * * * requirements for a corporation." He contends that DAB was merely a "trust." The evidence does not support petitioner's theory. At trial, petitioner testified upon cross-examination that he and his siblings were shareholders of DAB and that he served as its president. Petitioner's disavowal of DAB's liquidating distribution is at odds with the state transfer tax returns for DAB in 1961. Petitioner executed such returns on behalf of the corporation, representing that various distributions made by DAB in that year to the DAB stockholders were exempt from the transfer tax since they were made in order to effect the liquidation of DAB. Similarly, petitioner's exhibits include work sheets for DAB's 1957 filing of "U.S. Information *342 Return Distributions in Liquidation." In sum, we cannot accept petitioner's thesis. It is clear that petitioner inherited DAB stock from his father; DAB's subsequent 1964 distribution to petitioner was properly determined to be long-term capital gain from the liquidation of a corporation. Transactions with Sulinc
On August 5, 1961, petitioner filed a corporate charter with the appropriate Pennsylvania authorities for the formation of Sulinc corporation. Petitioner owned property at 7334 through 7740 Summerdale Avenue in the northeast section of Philadelphia (Summerdale Avenue property), such property having a cost basis in petitioner's hands of $7,860.19. Petitioner planned to construct an apartment building on the Summerdale Avenue property and chose to proceed with the construction project in corporate form. Petitioner exchanged the Summerdale Avenue property and $500 paid-in capital for all of the stock of Sulinc. Petitioner served as Sulinc's president and, in that capacity, he received a firm commitment from the First Pennsylvania Bank and Trust Company in May, 1962, for a permanent mortgage and construction money in the amount of $100,000. The loan was to be serviced *343 by Colonial Surety Company, which would pay the various subcontractors as construction progressed. Disbursements made by Colonial were charged against the First Pennsylvania Bank and Trust Company loan after approval by Colonial and petitioner. For the taxable years 1962 and 1963, Sulinc reported no taxable income in its Federal income tax returns. During this period, Sulinc held title to the Summerdale Avenue property, obtained construction financing, negotiated contracts and obtained services in connection with the construction of the apartment building, maintained a checking account, filed state and Federal tax returns, and otherwise engaged in activities as a corporation. In addition to the initial transfers of land ($7,860.19) and cash ( $500) to Sulinc, the following additional amounts were deposited in the Sulinc bank account, which respondent included in his calculation of petitioner's basis in the Sulinc stock: Amount Source
1962
1963
Deposits from peti-
tioner's individual
bank accounts to
Sulinc account
$2,230.00
$ 74.85
Unexplained deposits [8]
9,593.38
708.13
*344 Petitioner also drew checks from one of his individual bank accounts for the benefit of Sulinc in 1962. These checks totaled $3,680.78. Thus, respondent determined that petitioner contributed a total of $24,647.33 to Sulinc. [9] In order to determine petitioner's basis in his Sulinc stock, respondent decreased this amount by the sum of money withdrawn from the Sulinc bank account which was determined to be for petitioner's personal benefit ($14,133.35). As a result, petitioner's net capital contribution to Sulinc and his basis in Sulinc stock was figured at $10,513.98. In November, 1962, while the apartment building was under construction, petitioner, on behalf of Sulinc, entered into an agreement of sale for the Summerdale Avenue property. The sale price was set at $125,000, of which $100,000 consisted of the mortgage to be assumed by the buyer. Respondent then concluded that Sulinc realized the following amount from the sale: Sale price
$125,000.00
Mortgage assumed
(100,000.00)
Credits due buyer
( 1,022.88)
City of Philadelphia
( 46.74)
Notary fees
( 5.25)
Colonial Surety
(for refrigerators
and air conditioners)
( 1,700.00)
Amount realized
$ 22,225.13
*345 Of this amount, $5,000 was paid to Sulinc in November, 1962, as a down payment; the balance was paid in three unequal payments in 1963. Respondent thus claims that petitioner received at least $19,652.18 [10] as a liquidating distribution from Sulinc in 1963. When this figure is decreased by petitioner's basis in Sulinc stock ($10,513.98), petitioner had a gain of $9,138.20 which respondent treated as long-term capital gain entitled to a section 1202 deduction. Petitioner views his financial relationship with Sulinc in a different light. Petitioner characterizes his initial transfer of cash and property to the corporation as advances creating a bona fide indebtedness on Sulinc's part that became deductible to petitioner as worthless in 1963 upon Sulinc's liquidation. As for subsequent transfers (both direct deposits to the Sulinc account and checks drawn on petitioner's other bank accounts for the *346 benefit of the corporation), petitioner terms these expenditures ordinary and necessary business expenses deductible by him personally, since Sulinc was a mere "straw." In support of this contention, petitioner alleges that, during the years in question, he was in the trade or business of being a builder. Thus, petitioner would have us ignore the viability of Sulinc for some purposes and then resurrect it for others. On the one hand, we would have to disregard Sulinc as a corporate entity in order to sustain petitioner's claimed building expenses. On the other hand, we would have to recognize the separateness of Sulinc to determine whether petitioner and the corporation stood in creditor-debtor relationship, a prerequisite to the allowance of a bad debt deduction. Cf. O'Neill v. Commissioner,170 F. 2d 596 (2d Cir. 1948). The general rule regarding tax recognition of the corporate entity has been stated thusly: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation *347 or to avoid or to comply with the demands of creditors, or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. [Footnotes omitted.] [Moline Properties, Inc. v. Commissioner,319 U.S. 436, 439 (1943).] The exceptions to this rule are narrow, especially when asserted by the taxpayer rather than the Commissioner. Commissioner v. State-Adams Corporation,283 F. 2d 395, 398-399 (2d Cir. 1960); David F. Bolger,59 T.C. 760, 767, n. 4 (1973). While it is true that a mere corporate "dummy," created solely as the agent or nominee of an individual taxpayer would be disregarded for tax purposes ( Paymer v. Commissioner,150 F. 2d 334 (2d Cir. 1945)), Sulinc does not fall within that classification. Sulinc had assets; it applied for and received construction financing; it contracted for, received, and was billed for building materials and services; it maintained its own bank account. See Britt v. United States,431 F. 2d 227, 234 (5th Cir. 1970); *348 Commissioner v. State-Adams Corporation,supra;Collins v. United States,386 F. Supp. 17 (S.D. Ga. 1974), affd. per curiam 514 F. 2d 1282 (5th Cir. 1975). [11] Petitioner would have us believe that Sulinc held bare title to the Summerdale Avenue property. Further, he argues that since it was he who transacted business for Sulinc, we must view him as the builder. Since a corporation cannot act except through its agents, we would expect petitioner, as an officer of Sulinc, to participate in such activities. Petitioner apparently understood that his activities were on behalf of the corporation rather than himself. Petitioner signed correspondence, authorized corporate disbursements, applied for financing, opened and maintained a bank account, etc., under the name of Sulinc Corporation as its president. Sulinc clearly engaged in sufficient activity to warrant recognition as a viable tax entity. As such, Sulinc, and only Sulinc, is entitled to deduct its trade or business expenses. [12] Petitioner's trade or business expense deductions and depreciation deductions are limited to those allowed by respondent as incurred in connection with *349 petitioner's legal business. Because petitioner has not claimed any expenses in respect of his Sulinc officership or investment activities, we need not decide whether petitioner's managerial or investment activities relating to Sulinc constituted a separate trade or business. [13]
*350 Petitioner's claimed bad debt deduction suffers from two fatal flaws. First, whatever the characterization of the asset in petitioner's hands (stock or debt), respondent's calculations show that petitioner fully recovered his investment in Sulinc and then some. Petitioner has not proved otherwise. Thus, even if we were to accept petitioner's characterization, he has suffered no loss. Second, we think petitioner's attempt to style obvious capital investments as loans is totally without merit. Petitioner claims he received nothing in return for his initial transfer of land and cash. Petitioner, however, admits the receipt of Sulinc stock in return therefor. [14]The issue of whether or not stockholder advances to a corporation constitute debt or equity is a question of fact. Litton Business Systems, Inc.,61 T.C. 367, 376 (1973). Were we to agree with petitioner, Sulinc would have had no capitalization. Advances to a new corporation with little or no paid-in capital are clearly capital contributions. See Phil Kalech,23 T.C. 672, 680 (1955), and cases cited *351 therein. Petitioner himself casts the items in question in terms of "original capital investment" and "paid-in capital." Therefore, respondent properly disallowed a bad debt deduction in his redetermination of petitioner's income. Other Deductions
In petitioner's income calculations for each of the years in question, he allows himself a $1,500 "cost-of-living" deduction. Apparently, petitioner has mistakenly translated the "estimated annual cash expenses" item of income inclusion under respondent's reconstruction of income (see p. 4, supra) into an item deductible from income. In any event, there is no authority for such a deduction, statutory or otherwise. Furthermore, since petitioner has not proved otherwise, we sustain respondent's inclusion of $1,500 in each year as income represented by estimated cash receipts which were expended for personal living costs. Cf. Oswald Jacoby,T.C. Memo. 1970-244. Since *352 we have no evidence to indicate that petitioner had itemized deductions, we have allowed him the standard deduction. Exemptions
Petitioner claims the following exemptions for the taxable years in question: Number of Year
exemptions
1962
5
1963
1
1964
1
In 1964, petitioner married Susan Mortelite. For the taxable year 1964, however, Susan filed a separate tax return as "married filing separately." Apparently, the four dependents petitioner claims for 1962 are his son, daughter-in-law, and two grandsons. The only evidence before us relating to the existence of any such persons is a group of photographs which petitioner testified included one photograph of his son. We have no information concerning the age or employment status of any of the alleged dependents. Nor have we seen any proof that petitioner provided any degree of support for such persons. Since petitioner has come forward with no probative evidence in respect of this issue, we must agree with respondent that petitioner is only entitled to one personal exemption for 1962. Additions to Tax
Respondent has assessed against petitioner additions to tax for failure to file tax returns *353 without reasonable cause and for failure to pay taxes due to negligence or intentional disregard of rules and regulations during the years in question. Petitioner has presented no evidence which would preclude the imposition of any such additions to tax. Accordingly, petitioner is liable for such additions under section 6651(a) and 6653(a). With respect to the failure to pay estimated taxes, the imposition of the addition to tax under section 6654 is mandatory. Estate of Barney Ruben,33 T.C. 1071, 1072 (1960). * * * * *
The long and the short of this case is that, for the reasons stated herein and the fact that as to items not discussed petitioner has either agreed with respondent's figures or has failed to provide sufficient evidence to carry his burden of proof, petitioner's gross income, deductions and exemptions, and resulting taxable income are those set forth on page 10, supra. The deficiencies and additions to tax under sections 6651(a), 6653(a), and section 6654 should be calculated accordingly. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. Respondent's calculations are based upon five bank accounts attributable to petitioner. These are: petitioner's attorney account, petitioner's personal account, petitioner's savings account, petitioner's wholly-owned corporation's account (Sulinc), and petitioner's wife's account (Crusader account). Subsequently, respondent conceded any items relating to the Crusader account were not attributable to petitioner. Also the savings account was deemed to be a source of interest income only. ↩
3. Respondent also felt that this type of income reconstruction was appropriate here, since petitioner was known to have used aliases and straws in trans-acting certain business dealings. At various times in his life, petitioner was also known as or used the following designations: A. L. Beneten, Bently Organization, William Stickney, A. L. Stone, and Mary Becker.↩
1. This figure is petitioner's long-term capital gain realized on a liquidating distribution from his wholly-owned corporation, Sulinc, after application of the section 1202 deduction. ↩
3. This item represents a referral fee. ↩
2. This figure was determined to be a short-term capital gain realized by petitioner on the sale of real estate at the corner of Langdon and Hartel Streets. ↩
4. Petitioner and his wife filed separate returns. See p. 23, infra:↩ sec. 141.
4. The income calculations in respondent's brief include this item for 1962. Under the circumstances, the stipulation of facts controls.↩
1. Respondent also concedes that $13.39 and $20.72 of interest attributable to this account in 1962 and 1963, respectively, and included in the statutory notice of deficiency, should not constitute income to petitioner.↩
5. Since petitioner inherited DAB stock from his father, his basis therein would be determined under section 1014 providing that the basis of property acquired from a decedent is the fair market value of such property at the date of decedent's death. No direct evidence was presented as to the value of DAB stock at his father's death in 1957. However, included in petitioner's exhibits is petitioner's work sheet for the Commonwealth of Pennsylvania Capital Stock and Corporate Net Income Tax Report for DAB for the fiscal year begun May 1, 1957 and ended April 30, 1958. This sheet indicates that petitioner, as president of DAB, valued the corporation's capital stock at zero. Upon audit in 1961, the Pennsylvania Department of Revenue apparently determined the value of the capital stock to be $200,000 during this period. It is not clear from the record whether DAB paid the capital stock tax based upon the audit value or settled its tax liability based upon some lesser value. Under the foregoing circumstances, we think it was incumbent upon petitioner to come forward with evidence to rebut his own valuation.↩
1. Interest income shifted from 1962 to 1963. ↩
2. The John Herman fee. ↩
3. Consisting of the $2,250 gain from the sale of the Langdon and Hartel Streets property and $4,569.10 representing the revised long-term capital gain (after section 1202 deduction) on the Sulinc liquidating distribution. ↩
4. Consisting of the referral fee included in the statutory notice of deficiency and $709.02 representing long-term capital gain (after the section 1202 deduction) on the DAB liquidating distribution. ↩
5. Respondent's figure of $16,791.84 (Resp. brief, p. 49) appears to be in error because it fails to eliminate the $500 deposit in the Crusader account and the $20.52 stipulated as interest in 1963 rather than 1962. ↩
6. Aside from $20.52 interest, respondent's computation (Resp. brief, p. 49) reflects a $3,000 mathematical error in addition. ↩
7. Although this figure agrees with respondent's gross income figure on p. 49 of his brief, respondent's taxable income computations on p. 51 of his brief are based on an erroneous gross income figure of $5,289.83. The $610.00 difference is presumably due to a double counting of the $610.00 bank deposits income item. ↩
8. Respondent's computation (Resp. brief, p. 50) reflects a $200 mathematical error in addition.↩
9. Computed on the basis of 10 percent of adjusted gross income, i.e., after Schedule C deductions. In this case, depreciation appears to constitute a Schedule C deduction. We also note that, in his brief (p. 51), respondent has failed adequately to differentiate between the standard deduction and the deduction for petitioner's exemption.↩
6. See also James T. Bennett,↩ a Memorandum Opinion of this Court dated January 31, 1950.
7. See also Joseph W. Monahan, Jr.,T.C. Memo. 1968-234↩.
8. These items respondent charged to petitioner as income on the ground that, absent an explanation, they constituted items of income to petitioner which petitioner caused to be deposited in the Sulinc account.↩
9. This figure represents certain concessions made by the respondent since the issuance of the deficiency notice which had placed the petitioner's contributions at $22,891.67.↩
10. Respondent only charges petitioner with this amount rather than the $22,225.13 realized by Sulinc. The record does not indicate what this difference represents, but, since petitioner is charged with the lesser amount, we have no need to delve into the question of correlation.↩
11. See also Daniel E. Rogers,T.C. Memo. 1975-289↩. 12. As we said in Ernest L. Rink,51 T.C. 746, 751 (1969)-- * * * The rule is well-established that a shareholder, even a majority or sole shareholder, is not entitled to a deduction from his personal income for his payment of the expenses of his corporation; such amounts constitute either a loan or a contribution to the capital of the corporation and are deductible, if at all, by the corporation. [Footnote omitted.] ↩
13. Because of the result reached herein, we also need not reach petitioner's contention that he sustained a net operating loss from his building business in 1962 and that such loss is available for carry-over to reduce his income in 1963 and 1964. By our disallowance of the building expenses as well as petitioner's claim for a business bad debt deduction (see infra↩), petitioner had adjusted gross income of $13,963.32 and taxable income in the amount of $12,363.32 for 1962.
14. While the record before this Court includes no documentary evidence showing the issuance of Sulinc shares to petitioner, petitioner admits that, upon making his capital contribution to Sulinc, he became a stockholder and corporate officer.↩